## AMERICAN STEEL FOUNDRIES v. TRI-CITY CENTRAL TRADES COUNCIL ET AL.

CERTIORARI TO THE CIRCUIT-COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 2. Argued January 17, 1919; restored to docket for reargument June 1, 1920; reargued October 5, 1920; restored to docket for reargument June 6, 1921; reargued October 4, 5, 1921.—Decided December 5, 1921.

1. A decree of injunction in a labor controversy was entered in the District Court before the date of the Clayton Act, c. 323, 38 Stat. 738, but was pending on appeal in the Circuit Court of Appeals when the act was approved. *Held,* that the plaintiff had no vested right in the decree, and that the act was to be regarded in determining the appeal. P. 201.

2. The irreparable injury to property referred to in the first paragraph of § 20 of the Clayton Act, *supra,* includes injury to the business of an employer. P. 202.

3. The second paragraph of § 20 of the Clayton Act does not apply to a dispute between an employer and persons who are neither ex-employees nor seeking employment. *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443. *Held,* in this case, that only those defendants who left the plaintiff's employ when a strike was called

by the defendant labor union, as distinguished from those who had been employed but were laid off some months previously and those who had not been in the employment, could invoke § 20 in their behalf. P. 202.

4. The Clayton Act, § 20, in forbidding injunctions to restrain employees, recent or expectant, from the use of peaceful persuasion in promotion of their side of the controversy, or from obtaining or communicating information in any place where they may lawfully be, merely declares and stabilizes what was always the best equity practice. P. 203.

5. Workmen have the right to work for whom they will and to go freely to and from their place of labor undisturbed by annoying importunities or by the intimidation of numbers; and their employer has a right, incident to his property and business, that they have free access to the place where the business is conducted. P. 203.

6. The "picketing" of an employer's plant by groups of men stationed near the points of ingress and egress and in neighboring streets, who importunately intercepted the workmen of the employer or others seeking employment, and whose activities collected crowds of bystanders and resulted in personal violence, *held* unlawful and to be enjoined *eo nomine*, without adding the words "in a threatening or intimidating manner." Pp. 204, 207.

7. Such "picketing" creates a condition of intimidation in which there can be no peaceable communication of information or peaceable persuasion in the sense of the Clayton Act. P. 205.

8. An injunction for the protection of an employer in a strike controversy should be adapted to the facts of the particular case, safeguarding his rights while affording to ex-employees and others properly acting with them opportunity, consistent with peace and law, to observe who are still working for the employer, to communicate with them and to persuade them to join his opponents. *Held*, in this case, that the strikers and their sympathizers should be limited to one representative for each point of ingress and egress at the plant, and that all others should be enjoined from congregating or loitering about the plant or in neighboring streets affording access thereto, that such representatives should have the right of observation, communication and persuasion, avoiding abuse, libel or threats, and in their efforts singly should not obstruct an unwilling listener by importunate following or dogging of his steps. P. 206.

9. An injunction broadly forbidding ex-employees from persuading employees and would-be employees to leave or stay out of the employment conflicts with the Clayton Act, *supra.* P. 208.

Where the members of a local labor union, though not ex-employees within the Clayton Act, have reason to expect reëmployment at a plant where wages have been reduced, interference by them and their union by peaceable persuasion and appeal to induce a strike against the lowered wages, is not malicious or without lawful excuse, and the principle against malicious enticement of laborers does not apply. P. 208. *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229; and *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, distinguished.

238 Fed. 728, reversed in part and affirmed in part.

REVIEW of a decree of the Circuit Court of Appeals which affirmed, with important modifications, a decree of injunction rendered by the District Court at the suit of the present petitioner against the respondent labor union and individuals.

*Mr. Max Pam,* with whom *Mr. Harry Boyd Hurd* and *Mr. William E. Wheeler* were on the briefs, for petitioner.

The statutes of Illinois and the decisions of its Supreme Court, establishing the rule in that State with respect to the subject-matter of conspiracy, picketing and persuasion, should prevail. Crim. Code, c. 38, §§ 46, 158, 159; *Barnes & Co.* v. *Typographical Union,* 232 Ill. 424, 431, 434; *O'Brien* v. *People,* 216 Ill. 371; *Doremus* v. *Hennessy,* 176 Ill. 608, 614; *Purington* v. *Hinchliff,* 219 Ill. 159, 166, 167.

*Kemp* v. *Division No. 241,* 255 Ill. 213, does not modify the Illinois rule contended for by petitioner. Here the Trades Council arrogated to itself the prerogative to demand from petitioner a change in wages, without meeting or vote of the petitioner's employees and without authority or request of the employees.

Even the two men who quit the employ had no relation to the initiation of the strike and knew nothing of it

until after the strike had been launched. See *Henrici Co.* v. *Alexander,* 198 Ill. App. 568.

In each of the cases cited by the court below in support of its opinion there existed a controversy between employer and employee; a strike had been called by the employees and not by any stranger to the employer, nor by any outside organization unauthorized to represent or speak for the employees. In *Iron Molders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45, the company recognized the unions as the representatives of its employees and to have authority from them to strike, and in that capacity made the unions defendants.

There is involved here a strict rule of property, upon which the Supreme Court of Illinois has spoken. The federal courts will enforce the laws of the State, so construed.

Under the decisions of this court the rule in Illinois should control. The bill was filed on the basis of diversity of citizenship. Petitioner waived none of its rights under the laws of Illinois. *Burgess* v. *Seligman,* 107 U. S. 20, 33; *Bucher* v. *Cheshire R. R. Co.,* 125 U. S. 555; *Gormley* v. *Clark,* 134 U. S. 338.

The rule in Illinois relating to picketing without physical violence is sustained in other States and jurisdictions. *Atchison, Topeka & Santa Fe Ry. Co.* v. *Gee,* 139 Fed. 582; *Beck* v. *Teamsters' Union,* 118 Mich. 497; *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418; *Jones* v. *Van Winkle Gin & Machine Works,* 131 Ga. 336; *Sailors' Union* v. *Hammond Lumber Co.,* 156 Fed. 450; *Stephens* v. *Ohio State Telephone Co.,* 240 Fed. 759; *Vonnegut Machinery Co.* v. *Toledo Machine Co.,* 263 Fed. 192; *Kinloch Telephone Co.* v. *Local Union No. 2,* 265 Fed. 312.

*Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, and similar cases, sustain petitioner's contentions. The respondents were engaged in a conspiracy to force the

employees of petitioner, who were satisfied with their wages or conditions of labor, to abandon their employment, violate their contracts and thereby force the establishment of a new basis of employment between the petitioner and its employees. They were strangers to both and interlopers in a situation that was tranquil and contented and in which they had no interest.

It is not necessary that there should be time contracts. Employment at will is sufficient.

The law as announced in the *Hitchman Case* is supported in other States and jurisdictions. See *Old Dominion S. S. Co.* v. *McKenna,* 30 Fed. 48, 49; *United States* v. *Haggerty,* 116 Fed. 510; *Casey* v. *Cincinnati Typographical Union,* 45 Fed. 135; *State* v. *Glidden,* 55 Conn. 46; *Jersey City Printing Co.* v. *Cassidy,* 63 N. J. Eq. 759; *Frank & Dugan* v. *Herold,* 63 N. J. Eq. 443; *Flaccus* v. *Smith,* 199 Pa. St. 128.

In this case the conduct of respondents was so violent in its lawlessness, so brutal in its practice, that it comes within the class of cases requiring and justifying injunction because of the resort to intimidation, physical force and destruction.

The rights of petitioner by final decree were vested before the Clayton Act became law. No retroactive effect can be given it. While it may be contended that legislation subsequent to adjudication may affect proceedings between public bodies or between an individual and the public, no such rule can apply in a proceeding between private parties. *Pennsylvania* v. *Wheeling & Belmont Bridge Co.,* 18 How. 421, 431. A final judgment or decree is property just as much as any other form of property. *Memphis* v. *United States,* 97 U. S. 293, 296, 298; *Fisher's Negroes* v. *Dabbs,* 6 Yerg. (Tenn.) 119; *Livingston* v. *Livingston,* 173 N. Y. 377, 381; *Humphrey* v. *Gerard,* 83 Conn. 346; *Strafford* v. *Sharon,* 61 Vt. 126; *Merchants Bank* v. *Ballou,* 98 Va. 112; *Edwards* v. *Kearzey,* 96 U. S. 595, 600.

The Clayton Act was intended to govern the acts of courts of original jurisdiction and proceedings at *nisi prius* and could not practically be invoked on appeal. It cannot be made applicable to this case, because it is not a case involving or growing out of a dispute concerning terms or conditions of employment,—between employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment. There was no strike at this plant instituted by the employees or with the authority of the employees. There was no controversy or dispute between the petitioner and its employees. Only two of the employees left the employ of petitioner, and neither because of any strike of the employees.

Section 20 of the Clayton Act is further inapplicable because an injunction was necessary to prevent irreparable injury to property or to a property right for which there was no adequate remedy at law.

The Clayton Act not only is inapplicable in this case with reference to the acts of assault and violence and physical brutality, but also against picketing *per se*, unattended by acts of physical violence. *Montgomery* v. *Pacific Electric Ry. Co.*, 258 Fed. 382; *Dail-Overland Co.* v. *Willys-Overland, Inc.*, 263 Fed. 171; *Kinloch Telephone Co.* v. *Local Union No. 2*, 265 Fed. 312.

This court has decided that § 20 of the Clayton Act is not applicable to cases like this. *Paine Lumber Co.* v. *Neal*, 244 U. S. 459; *Hitchman Coal & Coke Co.* v. *Mitchell, supra; Eagle Glass & Manufacturing Co.* v. *Rowe*, 245 U. S. 275; *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443.

*Mr. Frank C. Smith* for respondents.

There is not a scintilla of evidence that the Trades Council, or other of the defendants, formed, or attempted to form, a conspiracy. The testimony of the officers is

that no unlawful act was authorized. Quite true, there is a difference of opinion as to what may be considered lawful. The officers believed that to place pickets on the streets leading to the plant, to try and persuade workingmen not to go in to work while the strike was on, was within the law. The District Judge, however, was of the opinion that any kind of picketing was unlawful.

For workingmen to organize into unions and to concentrate their unions under one head, the object of which is to improve the conditions of the toilers, is not an unlawful combination.

To order a strike is not unlawful. Labor unions have this right; and to picket a plant, and for pickets to try to persuade men from taking the places of those who go out in response to a strike order, is not unlawful. *Iron Molders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45; *In re Heffron,* 179 Mo. App. 639; *Beaton* v. *Tarrant,* 102 Ill. App. 129; *People* v. *Young,* 188 Ill. App. 208; *Karges Furniture Co.* v. *Amalgamated, etc., Union,* 165 Ind. 421; *Marx & Haas Jeans Clothing Co.* v. *Watson,* 168 Mo. 133; *American Steel & Wire Co.* v. *Wire Drawers' Unions,* 90 Fed. 608; *Gray* v. *Building Trades Council,* 91 Minn. 171; 18 Am. & Eng. Encyc. of Law, 2d ed., 87; High on Injunction, § 1415–j; *Levy* v. *Rosenstein,* 66 N. Y. S. 101; *Wood Co.* v. *Toohey,* 186 N. Y. S. 95; Clayton Act, § 20.

An injunction in an industrial dispute should not prohibit either persuasion or picketing. *Iron Molders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45; *United States* v. *Kane,* 23 Fed. 748; *Allis Chalmers Co.* v. *Reliable Lodge,* 111 Fed. 264; *Beck* v. *Teamsters' Union,* 118 Mich. 497; *Hamilton-Brown Shoe Co.* v. *Saxey,* 131 Mo. 212; *Gray* v. *Building Trades Council,* 91 Minn. 171; *Everett Waddey Co.* v. *Richmond Typographical Union,* 105 Va. 188; *People* v. *Young,* 188 Ill. App. 208; *In re Heffron,* 179 Mo. App. 639; *American Steel & Wire Co.* v. *Wire Drawers' Unions,* 90 Fed. 608; *Pope Motor Car Co.*

v. *Keegan,* 150 Fed. 148; *Searle Manufacturing Co.* v. *Terry,* 106 N. Y. S. 438; *Kinloch Telephone Co.* v. *Local Union No. 2,* 265 Fed. 312; Clayton Act, § 20.

Unless this court will hold an agreement to do peaceful picketing, thus trying to enforce a demand, unlawful, then the contention that the Council is an unlawful combination is without merit.

The claim that the Council did not represent the workers in the plant is beyond our comprehension. According to the testimony of plaintiff's superintendent, of the 1,300 laid off in November, only about 400 were called for. He said that 80 or 90 per cent. were old men and members of the various organizations. If a man is " laid off ", that does not signify he has severed his connection with his employer. It was these employees—the 80 or 90 per cent.—who, as members of various organizations, made complaint to the Council. Furthermore, it is our contention that none of the remaining 1,300 had severed their connection with the company. These could have returned, but did not do so, because of the reduction of wages. To say that the Council has no right to intercede in behalf of the employees of the company is absurd. The principle of " collective bargaining " is now too well established.

In every case the alleged assaults took place some distance from the plant. Whether justified or not, those charged with doing picket duty feel that " strikebreakers " were responsible for the assaults committed.

We contend that the Trades Council was strictly within its rights in doing peaceful picketing. Lawless acts—if any were committed—we have not sought to defend. *Kolley* v. *Robinson,* 187 Fed. 415; *Iron Molders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45; *Pope Motor Car Co.* v. *Keegan,* 150 Fed. 148; *People* v. *Young,* 188 Ill. App. 208.

The Illinois court, in *Kemp* v. *Division No. 241,* 255 Ill. 213, refused to follow rulings in *Franklin Union* v.

*People,* 220 Ill. 355; and *Barnes & Co.* v. *Typographical Union,* 232 Ill. 424. In *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, there were contracts not to join the union. In *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, no question of combination or peaceful picketing was considered.

Section 20 of the Clayton Act applies, expressly sanctioning peaceful picketing.

A court is not warranted in enjoining persons from congregating on the sidewalk, or from addressing remarks concerning the business of another, or from distributing circulars. *In re Heffron, supra; People* v. *Young, supra; Gray* v. *Building Trades Council, supra; Marx & Haas Jeans Clothing Co.* v. *Watson, supra.*

To prevent a workingman from exercising the right of persuasion would deprive him of the right of free speech, guaranteed by the Constitution. To prohibit his right at or near the plant, on the streets leading to it, or elsewhere, is too general. *Iron Molders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45; *Marx & Haas Jeans Clothing Co.* v. *Watson, supra;* 18 Am. & Eng. Encyc. of Law, 2d ed., 87; *United States* v. *Kane,* 23 Fed. 748; *Kolley* v. *Robinson,* 187 Fed. 415; *Kinloch Telephone Co.* v. *Local Union No. 2,* 265 Fed. 312; Clayton Act. § 20.

The plant was not injured, and no injunction should have issued, because no property right was involved. *Northern Pacific R. R. Co.* v. *Whalen,* 149 U. S. 157. Labor is not a commodity (Clayton Act, § 6,) and an employer has no property right in his workmen.

The decree of the District Court was fatally defective because it was vague and ambiguous,—a dragnet. *Laurie* v. *Laurie,* 9 Paige, 234; *Avery* v. *Onillon,* 10 La. Ann. 127; *Swift & Co.* v. *United States,* 196 U. S. 375; *Iron Molders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45, 46.

The Clayton Act is retroactive and controlling.

MR. CHIEF JUSTICE TAFT delivered the opinion of the court.

The American Steel Foundries is a New Jersey corporation operating a large plant for the manufacture of steel products in Granite City, Illinois.   In May, 1914, it filed a bill in the District Court for the Southern District of Illinois to enjoin the defendants, the Tri-City Central Trades Council, and fourteen individual defendants, some of them officers of the Council, all of them citizens of other States than New Jersey, from carrying on a conspiracy to prevent complainant from retaining and obtaining skilled laborers to operate its plant.   The bill charged that the conspiracy was being executed by organized picketing, accompanied by threats, intimidation and violence toward persons employed or seeking employment there.   The defendants in their answer admitted that the Central Trades Council had established a picket upon streets leading to the plant, with instructions to notify all persons entering it that a strike had been called because of reduction of wages, and to use all honorable means to persuade such persons not to take the places of the men on the strike; admitted the participation of individual defendants in the picketing, but denied threats of injury or violence or responsibility for the violence that admittedly had occurred.   After replication was filed, the cause was heard.   A restraining order issued on filing of the bill, and a final decree was entered by which defendants were "perpetually restrained and enjoined from in any way or manner whatsoever by use of *persuasion,* threats, or personal injury, intimidation, suggestion of danger or threats of violence of any kind, from interfering with, hindering, obstructing or stopping, any person engaged in the employ of the American Steel Foundries in connection with its business or its foundry in the City of

Granite City, County of Madison, State of Illinois, or else-where; and from interfering by *persuasion,* violence or threats of violence in any manner with any person desiring to be employed by said American Steel Foundries in its said foundry or plant; and from inducing or attempting to compel or induce by *persuasion,* threats, intimidation, force or violence or putting in fear or suggestions of danger any of the employees of the American Steel Foundries or persons seeking employment with it so as to cause them to refuse to perform any of their duties as employees of the American Steel Foundries; and from preventing any person by *persuasion,* threats, intimidation, force or violence, or suggestion of danger or violence, from entering into the employ of said American Steel Foundries; and from protecting, aiding or assisting any person, or persons in committing any of said acts; and from assembling, loitering or congregating about or in proximity of the said plant or factory of the American Steel Foundries for the purpose of doing, or aiding or encouraging others in doing, any of the said unlawful or forbidden acts or things; *and from picketing or maintaining at or near the premises of the complainant, or on the streets leading to the premises of said complainant, any picket or pickets,* and from doing any acts or things whatever in furtherance of any conspiracy or combination among them, or any of them, to obstruct, or interfere with said American Steel Foundries, its officers, agents or employees, in the free and unrestrained control and operation of its plant, foundry and property and the operation of its business; and also from ordering, directing, aiding, assisting or in any manner abetting any person committing any or either of the acts aforesaid; and also from entering upon the grounds, foundry or premises of the American Steel Foundries without first obtaining its consent; and from injuring or destroying any of the property of the said American Steel Foundries."

There were twelve assignments of error on the appeal to the Circuit Court of Appeals, but the important ones which raised the issue in this case were as follows:

" Eighth. Because the complainant was not entitled to an injunction prohibiting the defendants while on the streets of Granite City or while in proximity to such foundry, from trying to persuade strike breakers from taking the places of the strikers.

" Ninth. Because the complainant was not entitled to an injunction prohibiting the defendants from stopping employees of complainant and suggesting to them that they should not work at such plant while a strike was on.

" Tenth. Because the complainant was not entitled to an injunction prohibiting the defendants from assembling, or congregating, in proximity of said foundry, or on the streets leading to such foundry.

" Eleventh. Because the complainant was not entitled to an injunction prohibiting the defendants from placing any picket, or pickets, upon the streets leading to such foundry, whose duty it was to notify those entering said foundry that there was a strike on."

The Circuit Court of Appeals modified the final decree by striking out the word " persuasion " in the four places in which it occurred, and by inserting after the clause restraining picketing the following: " in a threatening or intimidating manner."  238 Fed. 728.

The Tri-City Central Trades Council is a labor organization composed of representatives of thirty-seven trade unions of Granite City, Madison and Venice, adjoining towns in Illinois, including among them electricians, cranemen, mill hands, machinists, and stationary engineers.  In April, 1914, the complainant, which ordinarily in full operation employed 1600 men, and whose plant had been shut down since November of the previous year, resumed operations with about 350 of its regular men, 150 of whom belonged to the skilled trades, electricians,

cranemen, mill hands, machinists and blacksmiths. At this trial, the works manager testified: " When we opened April 6th we employed whoever we saw fit, whoever applied for employment at the gate. We only had called for in round numbers 300 men, and laid off approximately 1300 men. Eighty or ninety per cent. of the employees were old men. I assume these men were members of various organizations; I can't state definitely as to that." When business was resumed in April, half of the skilled workmen were given wages at rates from two cents to ten cents an hour below those paid before the plant had shut down. The Trades Council was advised of this about April 15th, and appointed a committee to secure reinstatement of the previous wages. The manager of the complainant told them that he ran an open shop, did not recognize organized labor and would not deal with the committee, but would entertain any complaint by an employee. The Council thereupon, on April 22nd, declared a strike on complainant's plant and displayed outside of the entrance to the plant a printed notice announcing that a strike was on at the plant and calling on union men and all labor to remain away from the works in order that an increase in wages might be secured. Only two men, defendants Churchill and Cook, acted upon the order to strike. Churchill was a member of the Machinist's Union. Cook was not a member of any union. The Council then established a picket, which was carried on for three or four weeks without intermission until the bill was filed on May 18th, and a restraining order issued.

Complainant's plant was in an enclosure of twenty-five acres and fronted on Niedringhaus Avenue. The Wabash and other railroads crossed this street and ran along the side of the plant. There were four tracks. The time keeper's gate of the plant opened on to the tracks. Directly opposite on the other side of the tracks was the Wabash depot, from three to four hundred feet from the

plant. It was on Niedringhaus Avenue, and this street was the one used by many of the plant's employees in going to their homes in Granite City and in reaching the terminal of the street car line which many used. Complainant's employees testified that, just as the picketing began, they were warned by some of the defendants that they would be hurt if they did not quit. The master mechanic of the plant, Hall, testified that Lamb, one of the defendants, the national representative of the Machinist's Union at St. Louis, when in company with four other pickets, handed him the circular of the Trades Council, and told him, " We don't like the way you have treated our boys down here, and we just came down to raise a little hell." Lamb admitted saying to Hall that the cut in wages was a severe one and that it looked as though they were going to raise hell in the town because conditions were good; that he didn't like to see a fight going on, but it looked as though it would come. The evidence showed that the pickets would stand about near the Wabash tracks, sometimes on the Foundries' side, sometimes on the depot side, sometimes on Niedringhaus Avenue, and that there were three or four groups of them varying from four to a dozen in each group. The headquarters of all the groups was at the Wabash depot.

There was an assault on April 30th, in which one Hafner, an employee, was attacked by three of the picketers. On May 8th, a man named Crabtree and four other employees were attacked by a group of more than seven of the pickets. On May 13th, another assault occurred, which developed into a mob, and two witnesses for complainant swore positively that the President of the Trades Council, Galloway, was engaged in this disturbance and was throwing bricks. There were other assaults, the last one on May 18th before the restraining order issued that day reached the picketers. Officers of the company testified that a number of men wounded in these assaults

were brought into the plant. All disturbances ceased after the restraining orders were served.

Galloway testified he was present at the plant three mornings for about fifteen or twenty minutes, and four or five evenings for maybe half an hour; that he engaged in no violence while he was there and saw none; that the representatives of the Central Trades were there doing picket duty, and that the closest he saw them to the plant was 20 feet in front of Wabash depot; that the Central Trades did not instruct anybody to assault anyone, but told them to picket the streets leading to the plant, and ask the men not to go into the plant or take work under the reduced wages. He said that the pickets were selected from the different crafts interested in the wages; that the joint board of the Council placed the pickets where they were, and the Council then sanctioned this action. He said he went down there to see that things were going right; that they placed the pickets there to prevent, if possible, the men from entering and working at the plant until they arbitrated the difference or advanced their wages to the former scale; that the pickets were not authorized to commit an unlawful act.

B. F. Lamb, already referred to, visited Granite City because he had a local union there affiliated with the Tri-City Trades Council. He went there three times a week during the strike, and did picket duty. He was on the picket line itself, which was about 100 or 120 yards from the plant. Pickets were merely there to convey information and ask coöperation. He denied that they authorized any assaults and he saw no assaulting. He heard of some fights which took place away from the plant, but he was in no way connected with them.

Hartbeck, who was business agent and secretary of the Blacksmith's Union, said that he acted on the picket line every time he went over there, sometimes in the evening, sometimes at noon time. He said the pickets would ap-

proach a man and tell him the conditions and request him to come out; that he did that himself, but that he never threatened anyone and never used any violence of any kind. He said: " In my estimation the four or five witnesses who swore to my presence at different times to assault testified falsely. . . . When the reduction of wages took effect, I was ordered by the superior of our District Board to go over there and to have men over there that would go to work to try to have them come out if they could under reduction of wages; probably some of our union men would go in unbeknowns of the trouble. At the time I went over there none of our men were at work in the plant because they had been sent for. But I went over anyway."

Harry McKenny, a picket, testified that he did assault one of the fellows there; that he, Churchill and another picket, were standing together, and that he told a man named Hafner, an employee, to stay away from the building; that Hafner called him an insulting and profane name, and said he would work where he pleased, and that then he hit Hafner; that he never tried to stop anybody from going into the plant by force; that he did hit Hafner while he was on the picket line; that he did not hit him because he was going into the works, but just because he called him a bad name.

Churchill, a striker and picket, said he "never struck a man over there; merely warned them, asked them to stay out of there; better keep away." He said that he was present when Hafner was hit by McKenny for calling him a bad name, that Hafner begged them not to hit him again, but McKenny hit him twice. Then Hafner said he was going home. Churchill said he was present when the porter from the plant was bringing in two lunch baskets, that someone kicked the baskets out of the porter's hands. Churchill said he was in the "bunch" standing there but he did not know who the man was

that upset them. He said two or three fights took place, and that he (Churchill) saw the big one with 200 men in it. He was half a block away.

Ishman, another picketer, said he was a craneman and resided at Granite City; that he was a member of the Cranemen's Union, that he did picket duty during the strike, that he was there quite a bit morning and evening; that the duty of the pickets was to inform the employees of the plant that there was a strike on and to inform them of the conditions under which they were working. He said that on May 8th, Crabtree, an employee, and four other employees, were coming across the railroad tracks from their work; that they had seven pickets there. He said they got to talking to them and somebody started a fight; he said somebody made a pass at him and that he hit somebody. He said they claimed it was Crabtree; that it was 150 yards from the plant.

Cook, a defendant who was not a union man, went out with the strike. He said he left because he did not like his wages, and quit because there was a strike on. Nobody sent him there as a picket, but he joined them, and they were all together picketing and talking to some men going to or coming from work. He said he wanted to quit work and did not want anybody else to work in his place.

It is clear from the evidence that from the outset, violent methods were pursued from time to time in such a way as to characterize the attitude of the picketers as continuously threatening. A number of employees, sometimes fifteen or more, slept in the plant for a week during the trouble, because they could not safely go to their homes. The result of the campaign was to put employees and would-be employees in such fear that many abandoned work and this seriously interfered with the complainant in operating the plant until the issue of the restraining order.

The first question in the case is whether § 20 of the Clayton Act, October 15, 1914, c. 323, 38 Stat. 738, is to be applied in this case. The act was passed while this case was pending in the Circuit Court of Appeals. In *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 464, a suit to restrain a secondary boycott had been brought before the passage of the act, but did not come to hearing until after its passage. It was held that, because relief by injunction operates *in futuro* and the right to it must be determined as of the time of the hearing, § 20 of the act, relating to injunctions, was controlling in so far that decrees entered after its passage should conform to its provisions. The decree here appealed from in the District Court had been entered before the Clayton Act passed. But the whole cause was taken up by the appeal. The complainant had no vested right in the decree of the District Court while it was subject to review. *Rafferty* v. *Smith, Bell & Co.*, this day announced, *post*, 226. The Circuit Court of Appeals was called upon to approve or to change the decree and was obliged, therefore, to regard the new statute in its conclusion, and so are we.

Section 20 is as follows:

" That no restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or. withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

It has been determined by this court that the irreparable injury to property or to a property right, in the first paragraph of § 20, includes injury to the business of an employer, and that the second paragraph applies only in cases growing out of a dispute concerning terms or conditions of employment, between an employer and employee, between employers and employees, or between employees, or between persons employed and persons seeking employment, and not to such dispute between an employer and persons who are neither ex-employees nor seeking employment. *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443. Only two of the defendants, Cook and Churchill, who left at the time of the strike, can invoke in their behalf § 20. We must, therefore, first consider the propriety of the decree as against them, and then as against the other defendants.

The prohibitions of § 20, material here, are those which forbid an injunction against, first, recommending, advising or persuading others by peaceful means to cease employment and labor; second, attending at any place where such person or persons may lawfully be for the purpose of peacefully obtaining or communicating information, or peacefully persuading any person to work or to abstain from working; third, peaceably assembling in a lawful manner and for lawful purposes. This court has already called attention in the *Duplex Case* to the emphasis upon the words " peaceful " and " lawful " in this section. 254 U. S. 443, 473. It is clear that Congress wished to forbid the use by the federal courts of their equity arm to prevent peaceable persuasion by employees, discharged or expectant, in promotion of their side of the dispute, and to secure them against judicial restraint in obtaining or communicating information in any place where they might lawfully be. This introduces no new principle into the equity jurisprudence of those courts. It is merely declaratory of what was the best practice always. Congress thought it wise to stabilize this rule of action and render it uniform.

The object and problem of Congress in § 20, and indeed of courts of equity before its enactment, was to reconcile the rights of the employer in his business and in the access of his employees to his place of business and egress therefrom without intimidation or obstruction, on the one hand, and the right of the employees, recent or expectant, to use peaceable and lawful means to induce present employees and would-be employees to join their ranks, on the other. If, in their attempts at persuasion or communication with those whom they would enlist with them, those of the labor side adopt methods which however lawful in their announced purpose inevitably lead to intimidation and obstruction, then it is the court's duty which the terms of § 20 do not modify, so to limit what

the propagandists do as to time, manner and place as shall prevent infractions of the law and violations of the right of the employees, and of the employer for whom they wish to work.

How far may men go in persuasion and communication and still not violate the right of those whom they would influence? In going to and from work, men have a right to as free a passage without obstruction as the streets afford, consistent with the right of others to enjoy the same privilege. We are a social people and the accosting by one of another in an inoffensive way and an offer by one to communicate and discuss information with a view to influencing the other's action are not regarded as aggression or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free and his employer has a right to have him free.

The nearer this importunate intercepting of employees or would-be employees is to the place of business, the greater the obstruction and interference with the business and especially with the property right of access of the employer. Attempted discussion and argument of this kind in such proximity is certain to attract attention and congregation of the curious, or, it may be, interested bystanders, and thus to increase the obstruction as well as the aspect of intimidation which the situation quickly assumes. In the present case the three or four groups of picketers, were made up of from four to twelve in a group. They constituted the picket lines. Each union interested, electricians, cranemen, machinists and blacksmiths, had several representatives on the picket line, and assaults and violence ensued. They began early and continued from time to time during the three weeks of the strike

after the picketing began. All information tendered, all arguments advanced and all persuasion used under such circumstances were intimidation. They could not be otherwise. It is idle to talk of peaceful communication in such a place and under such conditions. The numbers of the pickets in the groups constituted intimidation. The name " picket " indicated a militant purpose, inconsistent with peaceable persuasion. The crowds they drew made the passage of the employees to and from the place of work, one of running the gauntlet. Persuasion or communication attempted in such a presence and under such conditions was anything but peaceable and lawful. When one or more assaults or disturbances ensued, they characterized the whole campaign, which became effective because of its intimidating character, in spite of the admonitions given by the leaders to their followers as to lawful methods to be pursued, however sincere. Our conclusion is that picketing thus instituted is unlawful and can not be peaceable and may be properly enjoined by the specific term because its meaning is clearly understood in the sphere of the controversy by those who are parties to it. We are supported in that view by many well reasoned authorities, although there has been contrariety of view. *Barnes & Co.* v. *Typographical Union,* 232 Ill. 424; *Franklin Union* v. *People,* 220 Ill. 355; *Philip Henrici Co.* v. *Alexander,* 198 Ill. App. 568; *Vegelahn* v. *Guntner,* 167 Mass. 92; *Jonas Glass Co.* v. *Glass Association,* 72 N. J. Eq. 653, s. c. 77 N. J. Eq. 219; *Jersey City Printing Co.* v. *Cassidy,* 63 N. J. Eq. 759; *Frank & Dugan* v. *Herold,* 63 N. J. Eq. 443; *Goldberg, Bowen & Co.* v. *Stablemen's Union,* 149 Cal. 429; *Pierce* v. *Stablemen's Union,* 156 Cal. 70; *Local Union No. 313* v. *Stathakis,* 135 Ark. 86; *Beck* v. *Teamsters' Union,* 118 Mich. 497; *In re Langell,* 178 Mich. 305; *Jensen* v. *Cooks' & Waiters' Union,* 39 Wash. 531; *St. Germain* v. *Bakery & Confectionery Workers' Union,* 97 Wash. 282; *Jones* v.

*Van Winkle Gin & Machine Works,* 131 Ga. 336; *Union Pacific R. R. Co.* v. *Ruef,* 120 Fed. 102; *Atchison, Topeka & Santa Fe Ry. Co.* v. *Gee,* 139 Fed. 582; *Stephens* v. *Ohio State Telephone Co.,* 240 Fed. 759.

A restraining order against picketing will advise earnest advocates of labor's cause that the law does not look with favor on an enforced discussion of the merits of the issue between individuals who wish to work, and groups of those who do not, under conditions which subject the individuals who wish to work to a severe test of their nerve and physical strength and courage. But while this is so, we must have every regard to the congressional intention manifested in the act and to the principle of existing law which it declared, that ex-employees and others properly acting with them shall have an opportunity, so far as is consistent with peace and law, to observe who are still working for the employer, to communicate with them and to persuade them to join the ranks of his opponents in a lawful economic struggle. Regarding as primary the rights of the employees to work for whom they will, and, undisturbed by annoying importunity or intimidation of numbers, to go freely to and from their place of labor, and keeping in mind the right of the employer incident to his property and business to free access of such employees, what can be done to reconcile the conflicting interests?

Each case must turn on its own circumstances. It is a case for the flexible remedial power of a court of equity which may try one mode of restraint, and if it fails or proves to be too drastic, may change it. We think that the strikers and their sympathizers engaged in the economic struggle should be limited to one representative for each point of ingress and egress in the plant or place of business and that all others be enjoined from congregating or loitering at the plant or in the neighboring streets by which access is had to the plant, that such representatives should have the right of observation, communica-

tion and persuasion but with special admonition that their communication, arguments and appeals shall not be abusive, libelous or threatening, and that they shall not approach individuals together but singly, and shall not in their single efforts at communication or persuasion obstruct an unwilling listener by importunate following or dogging his steps. This is not laid down as a rigid rule, but only as one which should apply to this case under the circumstances disclosed by the evidence and which may be varied in other cases. It becomes a question for the judgment of the Chancellor who has heard the witnesses, familiarized himself with the *locus in quo* and observed the tendencies to disturbance and conflict. The purpose should be to prevent the inevitable intimidation of the presence of groups of pickets, but to allow missionaries.

With these views, it is apparent that we can not sustain the qualification of the order of the District Court which the Circuit Court of Appeals made. That court followed the case of *Iron Molders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45, and modified the order of the District Court which enjoins defendants " from picketing or maintaining at or near the premises of the complainant, or on the streets leading to the premises of said complainant, any picket or pickets " by adding the words " in a threatening or intimidating manner." This qualification seems to us to be inadequate. In actual result, it leaves compliance largely to the discretion of the pickets. It ignores the necessary element of intimidation in the presence of groups as pickets. It does not secure practically that which the court must secure and to which the complainant and his workmen are entitled. The phrase really recognizes as legal that which bears the sinister name of " picketing " which it is to be observed Congress carefully refrained from using in § 20.

There remains to consider, so far as defendants Churchill and Cook, the ex-employees, are concerned, the

part of the decree of the District Court which forbade them by persuasion to induce employees, or would-be employees to leave, or stay out of, complainant's employ. The effect of it is to enjoin persuasion by them at any time or place. This certainly conflicts with § 20 of the Clayton Act. The decree must be modified as to these two defendants by striking out the word "persuasion."

The second important question in the case is as to the form of decree against the Tri-City Trades Council and the other defendants. What has been said as to picketing applies to them, of course, as fully as to the ex-employees, but how as to the injunction against persuasion?

The argument made on behalf of the American Foundries in support of enjoining persuasion is that the Tri-City Central Trades Council and the other defendants being neither employees nor strikers were intruders into the controversy, and were engaged without excuse in an unlawful conspiracy to injure the American Foundries by enticing its employees, and, therefore, should be enjoined.

It is to be noted, that while there was only one member of the unions of the Trades Council who went out in the strike, the number of skilled employees then engaged by the Foundries was not one-quarter of the whole number of men who would be engaged when it was in full operation. The works manager said that eighty or ninety per cent. of the employees were old men and that he assumed these men were members of various organizations. Other witnesses, members of the unions, testified that they had been employees of complainant in the previous fall. It is thus probable that members of the local unions were looking forward to employment when complainant should resume full operation and even though they were not ex-employees within the Clayton Act, they were directly interested in the wages which were to be paid.

Is interference of a labor organization by persuasion and appeal to induce a strike against low wages under

such circumstances without lawful excuse and malicious? We think not. Labor unions are recognized by the Clayton Act as legal when instituted for mutual help and lawfully carrying out their legitimate objects. They have long been thus recognized by the courts. They were organized out of the necessities of the situation. A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body in order by this inconvenience to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has in many years not been denied by any court. The strike became a lawful instrument in a lawful economic struggle or competition between employer and employees as to the share or division between them of the joint product of labor and capital. To render this combination at all effective, employees must make their combination extend beyond one shop. It is helpful to have as many as may be in the same trade in the same community united, because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership and especially among those whose labor at lower wages will injure their whole guild. It is impossible to hold such persuasion and propaganda without more, to be without excuse and malicious. The principle of the unlawfulness of maliciously enticing laborers still remains and action may be maintained therefor in proper cases,

but to make it applicable to local labor unions, in such a case as this, seems to us to be unreasonable.

The elements essential to sustain actions for persuading employees to leave an employer are first, the malice or absence of lawful excuse, and, second, the actual injury. The effect of cases cited as authority must be determined by an examination of the pleadings and facts to see how the malice or lack of lawful excuse was established, and whether there was not illegality present in the means used. Thus *Walker* v. *Cronin,* 107 Mass. 555, and *Thacker Coal Co.* v. *Burke,* 59 W. Va. 253, suits by an employer against members of a labor union in which the right of action for persuading was sustained, were heard on demurrer to the complaint. The element of malice was supplied by averment of the complaint, and was, of course, admitted by the demurrer. There are other cases in which the persuasion was accompanied by the intent to secure a breach of contract, or was part of a secondary boycott or had elements of fraud, misrepresentation or intimidation in it. *Perkins* v. *Pendleton,* 90 Me. 166, was a case of the latter kind. In *Lucke* v. *Clothing Cutters,* 77 Md. 396, it was held unlawful in a labor union to seek to compel an employer to discharge the plaintiff by intimidation, and it was said that the state law authorizing formation of trade unions to secure most favorable conditions for labor of their members was not a warrant for making war upon the non-union man or for illegal interference with his rights and privileges. A suit by an employee who seeks to hold a labor union liable for seeking his discharge by threatening to strike unless his employer discharges him, stands on a different footing from a mere effort by a labor union to persuade employees to leave their employment. There are in such a combination against an employee the suggestions of coercion, attempted monopoly, deprivation of livelihood and remoteness of the legal purpose of the union to better its mem-

bers' condition, not present in a case like the present. Without entering into a discussion of those cases which include *Brennan* v. *United Hatters of North America,* 73 N. J. L. 729; *Curran* v. *Galen,* 152 N. Y. 33; *Berry* v. *Donovan,* 188 Mass. 354, and *Plant* v. *Woods,* 176 Mass. 492, it is sufficient to say they do not apply here.

The counsel for the Steel Foundries rely on two cases in this court to support their contention. The first is that of *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229. The principle followed in the *Hitchman Case* can not be invoked here. There the action was by a coal mining company of West Virginia against the officers of an International Labor Union and others to enjoin them from carrying out a plan to bring the employees of the complainant company and all the West Virginia mining companies into the International Union, so that the Union could control, through the union employees, the production and sale of coal in West Virginia, in competition with the mines of Ohio and other States. The plan thus projected was carried out in the case of the complainant company by the use of deception and misrepresentation with its non-union employees, by seeking to induce such employees to become members of the Union contrary to the express term of their contract of employment that they would not remain in complainant's employ if union men, and after enough such employees had been secretly secured, suddenly to declare a strike against complainant and to leave it in a helpless situation in which it would have to consent to be unionized. This court held that the purpose was not lawful, and that the means were not lawful and that the defendants were thus engaged in an unlawful conspiracy which should be enjoined. The unlawful and deceitful means used were quite enough to sustain the decision of the court without more. The statement of the purpose of the plan is sufficient to show the remoteness of the benefit ultimately to be derived by

the members of the International Union from its success and the formidable country-wide and dangerous character of the control of interstate commerce sought. The circumstances of the case make it no authority for the contention here.

*Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443, also cited, can have no bearing here. In that case, the International Association of Machinists, an unincorporated association, having a membership of more than 60,000, united in a combination to compel the complainant to unionize its factory, enforce the closed shop, the eight-hour day and the union scale of wages by boycotting the interstate trade of that company. They conducted in the City of New York a campaign of threatening the customers of the Printing Press Company, the trucking companies that carried its presses, and those who were engaged in the work of setting up such presses, with injury to them in their business, if they continued to deal with the Duplex Company or its presses. It was a palpable effort on the part of the International Association of Machinists to institute a secondary boycott, that is, by coercion, to use the right of trade of persons having nothing to do with the controversy between the Duplex Company and the Machinist's Union, and having no interest in it, to injure the Duplex Company in its interstate trade. This was decided not to be within § 20 of the Clayton Act, but was held, following the case of *Loewe* v. *Lawlor,* 208 U. S. 274, to be an unlawful combination in restraint of interstate trade. The *Hitchman Case* was cited in the *Duplex Case,* but there is nothing in the *ratio decidendi* of either which limits our conclusion here or which requires us to hold that the members of a local labor union and the union itself do not have sufficient interest in the wages paid to the employees of any employer in the community to justify their use of lawful and peaceable persuasion to induce those employees to refuse to accept such reduced wages

and to quit their employment. For this reason, we think that the restraint from persuasion included within the injunction of the District Court was improper, and in that regard the decree must also be modified. In this we agree with the Circuit Court of Appeals.

*The decree of the Circuit Court of Appeals is reversed in part and affirmed in part and the case is remanded to the District Court for modification of its decree in conformity with this opinion.*

MR. JUSTICE BRANDEIS concurs in substance in the opinion and the judgment of the court.

MR. JUSTICE CLARKE dissents.