DEERE MANUFACTURING COMPANY, appellant, v. IOWA EMPLOYMENT SECURITY COMMISSION, respondent-appellee; ALVIN E. CROWE et al, claimant-appellees.

DEERE MANUFACTURING COMPANY, appellant, v. IOWA EMPLOYMENT SECURITY COMMISSION, respondent-appellee; JOSEPH M. MAHER et al., claimant-appellees.

Nos. 49432
49433.

(Reported in 90 N.W.2d 750)

JUNE 3, 1958.

Wayne G. Cook, of Davenport, and Gibson, Stewart & Garrett, of Des Moines, for appellant.

Don G. Allen, of Des Moines, for Iowa Employment Security Commission, respondent-appellee, and Joseph M. Maher et al., claimant-appellees.

Connolly, O'Malley & McNutt, of Des Moines, for Alvin E. Crowe et al., claimant-appellees.

LARSON, J.—This appeal presents the question of whether individuals, who leave their available work because of a justifiable fear of violence should they cross picket lines established by another striking group, are disqualified for benefits under the Iowa Employment Security Law (chapter 96, Code, 1954).

The pertinent facts are not in dispute. The claimants are in two classes, those who belong to a nonstriking union, District No. 118 of the International Association of Machinists, and those who belong to no union. All are maintenance and experimental employees of the appellant, Deere Manufacturing Company. The company's production employees, represented by the United Auto Workers, C.I.O., as their bargaining representative, were

on strike. Picket lines about the plant were established on January 20, 1956, and the claimants were not permitted to enter the plant to perform their work. There was no work stoppage as to them as a result of the strike of the production workers.

The two classes of claimants tried their cases before the Iowa Employment Security Commission separately, but were by stipulation consolidated for appeal to the courts. The trial court upheld the majority opinion of the commission that the claimants were not disqualified for benefits due to their failure to appear for work awaiting them at the plant, and the company appealed.

It is the company's contention that these claimants are disqualified for benefits under section 96.5, subsection 1, in that they left their work voluntarily without good cause attributable to their employer, and that they introduced no sufficient or substantial evidence connecting the cause of their leaving their employment to the employer which could justify such a finding by the commission. Insofar as the trial court denied this contention, we think it erred.

 Code, section 96.5, provides in part: "An individual shall be disqualified for benefits: 1. * * * If he has left his work voluntarily without good cause attributable to his employer, if so found by the commission." As we have often pointed out, the words "attributable to his employer" did not appear in the original Act. (Chapter 4, Laws 46th G. A., Extraordinary Session, and chapter 102, Laws 47th G. A.) Wolf's v. Iowa Employment Security Commission, 244 Iowa 999, at 1002, 59 N.W.2d 216, 217. We determined therein that considerable significance must attach to this amendment and that a clear legislative intent to limit the area in which benefits could be obtained under this law was disclosed.

The original purpose of this Act appears in Code section 96.2 entitled "DECLARATION OF STATE PUBLIC POLICY." It provides:

"As a guide to the interpretation and application of this chapter, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this

state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. This can be provided *by encouraging employers to provide more stable employment* and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure, *under the police powers of the state, for the compulsory setting aside of unemployment reserves* to be used for the benefit of persons unemployed through no fault of their own." (Emphasis supplied.)

I. A statute, of course, must be construed by considering all its provisions and the language used therein, including its express purpose. Hansen v. Iowa Employment Security Comm., 239 Iowa 1139, 34 N.W.2d 203; Dingman v. Council Bluffs, 249 Iowa 1121, 90 N.W.2d 742. There is not the slightest hint that the purpose here was to compel the employer to set aside or contribute funds to be used directly or indirectly as a strike fund, nor that this fund should be used directly or indirectly as an economic weapon to assist any group to force the employer to accede to its demands. The statutory language rejects it. It is true it is for "persons unemployed through no fault of their own", but that is only one of the requirements. It is not the only requirement, nor is it conclusive. It is evident an employer's account, drained by unintended benefits, would be required to pay considerably greater contributions than otherwise into the unemployment fund, and such penalties would more than offset the good business practices which are encouraged by the Act in order to reduce the employer's percentage of contributions and the periods of unemployment in any given community. Section 96.7, Code, 1954. The 1939

amendment of "good cause attributable to his employer" further indicates a rejection of any such possible purpose as contended for by appellees here.

While it is also true there is nothing in the language of the Act to justify the conclusion that benefits accrue only when unemployment is the result of some wrongful act or some fault of the employer, yet we have not felt that the legislature ever intended that benefits accrue unless the facts and circumstances disclose *a direct connection* between the functions of the employment and the thing that makes it impossible for one to continue to work. Thus in the recent case of Raffety v. Iowa Employment Security Comm., 247 Iowa 896, 76 N.W.2d 787, we found as did the Minnesota court in Fannon v. Federal Cartridge Corp., 219 Minn. 306, 18 N.W.2d 249, 158 A. L. R. 389, that illness or disability caused by the employment which made it impossible for the claimant to continue his tasks did not deprive him of benefits under the Act. On the other hand, if the illness or disability was not directly connected with the quitting, we refused benefits under the Act. See Wolf's v. Iowa Employment Security Comm., supra, and cases discussed therein, in which we held illness and disability causing the claimant to leave her employment *not directly connected* with her employment disqualified her from receiving benefits under the Act. This Act, we think, was not intended to extend coverage to situations or conditions unrelated to the actual tasks of employment. Thus, when the danger or injury comes from outside sources which are not related to the work or duties for which one is employed, the claimant is not entitled to benefits from this fund even though such danger is found sufficient to make one's quitting involuntary.

II. Involuntary quitting or remaining away from one's employment for good cause alone is not determinative of the question of whether one is disqualified for benefits under chapter 96 of the Iowa Code, 1954. On several previous occasions we have discussed this language found in Code section 96.5 and decided that an involuntary quitting or voluntary leaving of one's employment for good cause may or may not disqualify a claimant for benefits, depending upon whether it is shown by substantial evidence that the cause was directly connected with the

employment or acts of the employer. Raffety v. Iowa Employment Security Comm., 247 Iowa 896, 76 N.W.2d 787, and Wolf's v. Iowa Employment Security Comm., both supra; Moulton v. Iowa Employment Security Comm., 239 Iowa 1161, 34 N.W.2d 211; Wolfe v. Iowa Unemployment Compensation Comm., 232 Iowa 1254, 7 N.W.2d 799.

The same conclusion was reached by the Minnesota Supreme Court in its interpretation of like provisions in their laws. We have heretofore cited the case of Fannon v. Federal Cartridge Corp., 219 Minn. 306, 18 N.W.2d 249, 158 A. L. R. 389, for support in our Raffety and Wolf's cases, supra. In the Wolf's case, found in 244 Iowa, supra, we cited numerous cases and discussed this matter rather completely and will not repeat it here. However, we made the distinction very clear that causes, good causes, which made the employees' actions in leaving the employment involuntary, when not directly connected with the work, or conditions in the place of employment could not be said to be attributable to the employer or the employment. Moulton v. Iowa Employment Security Commission, supra.

We have carefully read the cases cited us by appellees from other jurisdictions where fear of physical violence has been held good cause for one to remain away from his work and not cross a hostile picket line to reach available work. Texas Co. v. Texas Employment Comm., Tex. Civ. App., 261 S.W.2d 178; Shell Oil Co. v. Cummins, 7 Ill.2d 329, 131 N.E.2d 64; Steamship Trade Association of Baltimore v. Maryland Unemployment Comp. Bd. (Davis), 190 Md. 215, 57 A.2d 818; Kalamazoo Tank & Silo Co. v. Michigan Unemployment Compensation Comm., 324 Mich. 101, 36 N.W.2d 226. In all except the Michigan case there is no requirement in the statutes involved requiring that the cause be attributable to the employer. Under the wording of those statutes we can readily see where any good cause which makes the quitting involuntary, such as a real and present danger to one's life and family from threatening strikers if he crossed a picket line to work, would be included.

However, our legislature in 1939 decided to require that more be shown and added the words "attributable to his employer." Hansen v. Iowa Employment Security Commission,

supra. The Michigan courts apparently give slight import to those words and require of the employer duties far in excess of those normally thought of as connected to any employment of this nature. On the other hand, the Michigan decision may be explained due to the fact that the parking lot furnished employees of both plants (one struck and the other not) was kept under company control and supervision. The court seemed to hold that the company assumed certain protective duties which, when breached, gave rise to a cause attributable to the employer. Such is not the case before us. If this was not a valid distinction, then we find no logic that would make unlawful, vicious and tortious acts by striking pickets to scare employees from their work a good cause which could be attributed to the employer.

Appellees stress the importance of the showing herein that they did not "voluntarily" leave their work, and contend that the evidence showed clearly that they did not appear for work for "good cause." We agree that such a showing was quite material and important, and although its full purpose may not have been contemplated by the referee, such belief did not affect its import in this matter.

We are content to agree with the appellees, the commission, and the trial court that the failure of claimants to appear was shown to be for "good cause" and was necessary so that claimants could not be found disqualified for "participating" under section 96.5(4a).

III. However, the ultimate question here is whether the facts and circumstances shown which made the leaving of the work involuntary was also sufficient to prove that it was so directly connected with the claimants' employment as to justify a finding that it was attributable to the employer. It is attributable to somebody, but can it reasonably be said that it was attributable to the employer? We think not. It was not the employer's men who interfered with claimants' efforts to return to their jobs. It was the striking union's pickets. Who or what produced the fears which caused the claimants to remain away from their employment? Was it anything connected with the work? Was it connected to anything the employer did or refused to do relative to the work? In the cases previously de-

cided by us, the cause, when shown directly connected with the work, certainly did not disqualify the party involuntarily remaining away.

In the case of Raffety v. Iowa Employment Security Comm., supra, it appeared that an employee, injured during the course of his employment, was advised by his doctors that he could return to work if given light work. We held that, when none was offered by his employer and he secured a light job with another employer, he did not voluntarily quit his work within the meaning of section 96.5(1). Under those conditions we decided that the quitting was not without good cause attributable to his employer and that he was not disqualified for unemployment benefits. Therein at page 899 of 247 Iowa, page 789 of 76 N.W.2d, we quoted with approval from the Minnesota case of Fannon v. Federal Cartridge Corp., supra, 219 Minn. 306, 307, 312, 18 N.W.2d 249, 250, 252, 158 A. L. R. 389, 392, 394. The wording of their statute is practically the same as section 96.5(1), " 'voluntarily and without good cause attributable to the employer * * *.' " In that case a woman employee was forced to quit because of some allergy for the gunpowder with which she worked. It was there stated that the termination of her employment was involuntary because its continuance would endanger her health and that "the separation of employment here was for 'good cause attributable to the employer.' " The court said: "By this we do not imply any wrongful act, negligence, or failure on the part of the employer here in supplying reasonable and safe working conditions. As we construe the law, the legislature did not intend that some wrongful act or negligence be first established by a claimant before termination of his employment on account of sickness or disease directly connected therewith could be said to be for 'good cause attributable to the employer.' Rather, we feel the legislature intended that, *where factors or circumstances directly connected with employment* result in illness or disease to an employe and make it impossible for him to continue therein because of serious danger to his health, termination of employment for this reason may correctly be said to be involuntary and for 'good cause attributable to the employer,' even though the employer be free from all negligence or wrongdoing in connection therewith." (Emphasis supplied.)

These, then, are apt illustrations of the type of *direct connection* that we think must be shown to avoid disqualification by the claimant when he leaves his work. It is quite apparent that the critical need for claimants in such matters is *proof* that the "good cause" is *directly connected to the employment,* in order to be attributable to the employer. Obviously, the answer depends greatly upon the circumstances and the duties they disclose were imposed upon or assumed by the respective parties.

The facts and circumstances here disclose that the work available to claimants was the same as before the strike. The danger was from without and had no direct connection with employment in the factory. Safe ingress and egress into and from the buildings in which claimants were employed were not involved, and no evidence introduced tended to show any physical hazards at the plant chargeable to the employer. The only hazards shown anywhere were created by the unlawful acts of outsiders and the inability or unwillingness of the peace authorities to perform their duty in protecting peaceful citizens in their travel of the public streets and highways in going to and coming from the plant. A duty to remove those hazards can hardly be within the scope of the requirement that the employer furnish a reasonably safe and healthy place of employment. Injury or hazard from willful, malicious acts of others outside the plant, we think, cannot have been intended as an employment-connected liability which may be attributable to the employer. On the other hand, appellant contends, with some merit, that claimants' action should be brought against those who are responsible for these atrocities—not against the funds to be conserved for a directly-connected loss of employment.

█ We deplore the laxity of peace officers who do nothing to protect life and property of innocent persons who have employment available and cannot accept it because of fear for themselves and their families. We cannot condone union activities which endeavor not only to bring economic pressure upon employers to meet certain demands by refusing to work, and attempt to enlist aid from others by peaceful persuasion, *but unlawfully engage in violence and acts of hostility toward those whose employment is not affected by the work stoppage and who have firm contracts for faithful service with the same employer.*

Here the claimants were not on strike. They had work available, and the work stoppage did not affect them. It was not more or less hazardous than before, except for the unlawful acts and threats of the strikers. Claimants were under contract to continue work, and the company tried to assist them in getting permission to pass through the picket lines.

It is true the company did not ask an injunction, but neither did these claimants nor their union. In fact, there was no substantial evidence of fault on behalf of either the claimants or the company. However, and most important, we think, there also was no substantial evidence of any direct connection between the employment and the threats or fear that made it impossible for claimants to continue to work.

■■ The U.A.W.-C.I.O. established the picket lines, and their pickets at the gates made the threats and performed the acts of violence against some of the claimants. Peaceful picketing alone is legally approved. American Steel Foundries v. Tri-City Central Trades Council (1921) 257 U. S. 184, 42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360; Thornhill v. Alabama (1940) 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093; Carpenters & Joiners Union v. Ritter's Cafe (1942) 315 U. S. 722, 62 S. Ct. 807, 86 L. Ed. 1143; Hughes v. Superior Court of California (1950) 339 U. S. 460, 70 S. Ct. 718, 94 L. Ed. 985. Violent picketing is not approved. See the extensive and able treatment of this subject in Milk Wagon Drivers Union of Chicago v. Meadowmoor Dairies, Inc. (1941) 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 836, 132 A.L.R. 1200. Thus when the pickets acted with maliciousness and other unlawful acts of violence, their conduct cannot be said to be anything attributable to the employer, either because the employer did not meet it with greater acts of violence or because it failed to get an injunction to prohibit the unlawful acts of the pickets. How this unlawful interference by the pickets with the rights of peaceful citizens to use the streets and highways to go to and come from their work can be called a cause attributable to the employer who does nothing but keep the work opportunity available is inconceivable! We cannot agree with the Michigan court that there is any imposed duty on the part of an employer to obtain injunctions to enjoin unlawful acts against its employees by organized or unorganized persons, and we certainly do not

hold that the employer must take the law into his hands and meet force with force in order to be relieved of the charge that the cause of involuntary absence was attributable to it. The cause was attributable to the unlawful acts of the pickets alone and it was their responsibility, not the employer's. We cannot attribute to the legislators of this state any intent to charge such involuntary unemployment to the employer's account in such matters or circumstances as are herein disclosed. To do so would soon deplete a fund established for a very different purpose than to assist one union to bring added economic pressure on the employer to meet its demands, just or unjust. The very fact that such result would be possible negatives any argument that the legislature had in mind that such a cause should be attributable to the employer so as to make these benefits available to those remaining away from their work due to the wrongful and illegal acts of persons other than their employer.

■ IV. There was some complaint that the company has changed its position since claimants filed their original applications for benefits under the Act. We do not find merit in this contention. While it is true evidence was produced to establish the involuntary nature of the claimants' action in remaining away from their available work, yet unless it was an involuntary action, these workers might well be disqualified for benefits under the provisions of section 96.5(4). Claimants needed to show they were not staying away from their work in sympathy with the strike of the production workers, and thus were charged with "participating in" the dispute. Section 96.5(4a). The company concedes sufficient evidence was produced which justified the commission's finding that the remaining away was involuntary and thus the claimants did not "participate" in the labor dispute. As previously stated, we agree that as to that issue the finding of the commission is conclusive and that the trial court was correct in recognizing that issue as settled. Citations for this proposition are unnecessary.

It must be clear, however, that that issue was not the only one involved and, while this factual determination must be followed as to "good cause" by this court, the issue as to whether such involuntary leaving was attributable to the employer is at

least a mixed question of law and fact for the court. Therefore, the commission's finding that there was good cause for the remaining away is not conclusive of the fact that the cause was so attributable to the employer as to establish a right to benefits. In addition, there was no substantial evidence to justify a finding that the cause was directly connected to the employment or to acts of the employer. Claimants did not carry their burden as to these issues. Thus, we conclude claimants have failed in their task to establish their right to the benefits involved.

V. Other matters argued in this case need not be considered in view of our conclusion on this question of law. The trial court's judgment confirming the claimants' right to benefits, if otherwise eligible, must be reversed.—Reversed.

PETERSON, C. J., and BLISS, GARFIELD, WENNERSTRUM, HAYS, and THOMPSON, JJ., concur.

OLIVER, J., concurs in result.

SMITH, J., not sitting.