By the WHOLE COURT.
O’NIELL, C. J.
The board of commissioners of the port of New Orleans has invoked the supervisory jurisdiction of this court to set aside an injunction issued by a judge óf the civil district court. The order of injunction, and the writ itself, in precise terms, forbade the board, and the members thereof, and their agents, police officers, and other servants, to exclude the plaintiffs, Henry Keegan ét al., from the public wharves of the port of New Orleans, where ships were being loaded or unloaded, while such work was going on. The writ has been held in abeyance by an order of this court, staying temporarily the proceedings in the civil district court.
The facts on which the order of injunction issued aré set forth in the pleadings in the court below. The plaintiffs, 16 in number, are resident taxpayers in the city of New Orleans." Pour of them are the Presidents, respectively, of four labor organizations, namely, Stevedores’ & Longshoremen’s Benevolent Society, Screwmen’s Benevolent Association, Longshoremen’s Protective Union & Benevolent Association, and Screwmen’s Benevolent Association No. 1. Each of the 12 other plaintiffs is a member of one or another of the organizations mentioned. They are all longshoremen or screwmen, and are usually employed by the steamship agents and owners in the port of New Orleans. On the 13th of September — last month — the plaintiffs, with the other members of the labor organizations mentioned, went on a ■strike, in consequence of disagreements and controversies, over wages and working conditions, that had arisen between them, on the one side, and their employers, on the other side, namely, members of the New Orleans Steamship Association, and other steamship agents and owners, operating in the port of New Orleans. On the 18th of September, the strike being yet on, the board of commissioners of the Port of New Orleans issued this order:
“That all persons shall be prohibited from entering or using the public wharves during the present strike unless it be on business in connection with the commerce and navigation of the port.”
Having knowledge of this order, the plaintiffs attempted, peaceably, as they allege, to enter upon the docks, and were prevented by the harbor police, employed by the board of commissioners of the port. On the 27th of September, the plaintiffs, some personally and others by their representatives, appeared before the board, at a meeting held in the board’s office, and protested against the enforcement of the board’s order, forbidding them and any one else — during the strike— to enter or use the public' wharves otherwise than for business in connection with the commerce or navigation of the port. Their request for a rescission of the order was refused by the board. Eleven days later — and on the twentieth day after the order complained of had been issued — plaintiffs filed this suit, praying that the board of commissioners, and the members thereof in their official capacity, and their officers, agents, and employees, should be perpetually enjoined and restrained from further enforcing or .attempting to enforce the aforesaid order, and “from interfering with petitioners, in any way whatever, in approaching, entering, going upon, .circulating around and through and otherwise exercising their legal rights in *644 and upon, the docks, wharvés, sheds, or other public property, under the administration of the said board of port commissioners,” etc. Plaintiffs prayed for and obtained a rule upon the board to show cause why the injunction should not issue forthwith, and remain in force pendente lite, on plaintiffs’ furnishing such bond and security as the court might order.
Having alleged the facts which we have stated, plaintiffs made the following allegations, which, for the most part, seem to be matters of inference, belief, or opinion, rather then matters of fact, viz.:
“That the board of commissioners of the port of New Orleans, whose control of the public-property along- the river front is purely administrative, exceeded its power in issuing a police regulation of the character of said order; that nowhere in law or custom can the authority therefor be found; and that the act of issuing and enforcing said order is unwarranted in law, ultra vires, unauthorized, and illegal.
“That, even if the state Legislature had seen fit to invest the said board with power and authority to issue a police regulation such as the aforesaid order (which petitioners deny), there was not and is not the slightest ground or suspicion which would have justified the issuance, or which would justify the enforcement, of such a drastic order; that the issuance of an order similar to the one now complained of has never, in the port’s history, been justified as a police measure; nor has it ever before been contemplated.
“That, during the present strike, after the walkout, and before the issuance of the dock board’s order, for a period of almost a week, there was, as a result of or growing out of said strike, no violence or breach of the peace, nor any other illegal act of any nature whatsoever, committed or threatened, on property administered by the board of port commissioners, or any other property along the river front; and that, therefore, there was and could have been no reasonable apprehension or suspicion that acts of violence or damage would occur upon the docks or along the river front; and that, therefore, the said order, even if it be not ultra vires (which your petitioners maintain it is), is inspired by favoritism, bias, and prejudice, and is an unfounded, uncalled for, unreasonable, arbitrary, and unwarranted exercise of police power, and is therefore illegal.
“That your petitioners firmly believe, and therefore aver, that, although nominally the said order prohibits the general public from entering upon the river front, in truth and in fact the said order was and is primarily aimed at your petitioners, together with their fellow members of the four striking unions, for the purpose of injuring and harassing your petitioners and their associates, with the object of forcing them to abandon their strike and to submit to the terms and conditions laid down by the steamship owners and agents; and that the said order was issued in furtherance of a policy of favoritism towards the shipping interests, and discrimination against your petitioners and their organizations, by the board of commissioners of the port of New Orleans, for reasons best known to the members of said board.”
The petition concludes with an allegation which seems to be somewhat irrelevant, and which is indignantly denied by the board, that, on two occasions, the steam tug Sampson, which was controlled and operated by the board, was used to convey nonunion men and strike breakers to fill the places of employment that had been vacated by the plaintiffs.
They did not disclose, in their petition, the purpose for which they desired to go upon the wharves, or state whether they were going there severally or in a group when they were stopped by the harbor police; neither did they allege that their mission was “on business in connection with the commerce and navigation of the port.” All that they alleged in that respect was that they desired to go upon the wharves, and “that your petitioners’ desire was and is a lawful one.”
In response to the rule to show cause why the injunction should not issue, the board of commissioners pleaded that the allegations of the petition did not set forth a cause or right of action. Having heard argument on the plea, the judge ruled that the allegations of the petition did disclose a cause of action. Thereupon, the board answered, admitting that the order complained of had been issued, and averring that it had been enforced without favor or discrimination, against the steamship agents having no busi *645 ness on the wharves as well as against other persons having no business there. The board denied that there was any intention or desire on the part of any of its members to take sides in the strike, or to favor the steamship owners or agents in any way. The board denied that the wharves and docks were public places, except for the purposes for which they were dedicated; denied that the plaintiffs’ purpose in attempting to go upon the wharves during the strike was a lawful purpose; and averred that their purpose and intention was to use the wharves for picketing, to aid them in their controversy with their employers; and that such a use of the wharves would be a private use, would be an impediment to the commerce of the port, and would be unlawful and improper. The board averred that it had the authority, and the duty, in an emergency such as a strike, to prevent the strikers 'using the wharves for their private or individual purposes, and to prevent any one’s using the wharves for any purpose other than the public purpose for which they were dedicated ; and that the board was, by the statutes of the state, specifically invested with the liolice power which the board was exercising, to protect the lives of the board’s employees and the property of the state.
The issue thus presented was argued and submitted on the pleadings; whereupon, the court, having taken the matter under eonsicleration, ordered that the injunction should issue, on plaintiffs’ giving bond for $5,000, with the statutory obligation to pay such damages as the defendant might suffer if the writ was wrongfully obtained. Having made an unsuccessful application for a rehearing or new trial, the board of commissioners filed its petition here for writs of certiorari and prohibition.
In compliance with the writ of certiorari and in response to the rule to show cause why the prohibition should not issue, the judge of the civil district court has sent up a certified copy of the record and has formally submitted the matter for decision.
The plaintiffs, Henry Keegan and others, filed a motion to rescind the temporary restraining order of this court, staying execution or enforcement of the order of injunction. The motion was based upon the averment that the civil district court had jurisdiction of the subject-matter and that the proceedings were regular. Answering the rule to show cause why the prohibition should not is^ue, the respondents, Keegan and others, repeat that the civil district court had jurisdiction of the injunction suit, that the proceedings were regular, and .that, therefore, the only remedy that the defendant board of commissioners had, if the judge of the civil district court erred in issuing the writ of injunction, was by an ordinary appeal from the judge’s order. In like manner, the brief filed for the respondents, Keegan and others, is devoted entirely to the argument that the supervisory jurisdiction of this court, to issue writs of certiorari or prohibition, is confined to cases where the inferior court is acting beyond its jurisdiction, or where there is lack of form or regularity ih the proceedings, or a want of due process of law.
It is argued, in respondents’ pleadings and brief, that the effect of our issuing a temporary restraining order, in a case like this, is to deprive the district courts of the authority given them by the Oonstitution and the Code of Practice to issue writs of injunction,. and to lodge such jurisdiction in the Supreme Court. We considered that phase of the case, very carefully, before granting the temporary restraining order. But we thought, also, of the converse of the proposition; that is, that, if our “control and general supervision over all inferior courts,” granted by the first paragraph of section 10 of article 7 of the Constitution (being article *648 94 of the Constitution of 1898 and of 1913, and article 90 of the Constitution of 1879), did not extend to an extraordinary case like this, any district court could arrest the police power of any political corporation within the territorial jurisdiction of the district court. It is true, there are cases inhere a delay in the granting of an injunction may cause irreparable injury; but there are also cases where the irreparable consequences of the granting of an injunction are more harmful than the act which was enjoined could ever be. When a case is presented in which the question has to be decided in limine litis, whether the act sought to be enjoined or the injunction itself is apt to result in the more serious or irreparable harm, the judge having original jurisdiction of the case must, primarily, decide the question; but his ruling is not final; and the only available or practicable recourse of the party ruled against is to appeal, not to the ordinary appellate jurisdiction, but to the supervisory jurisdiction of the appellate court.
If the only recourse of a person against whom an injunction causing immediate and irreparable injury has been issued is to take an ordinary appeal from the order of injunction, he has no available remedy. A suspensive appeal — one which stays execution of the judgment or order appealed from — maintains the status quo until a final judgment is rendered in the case. Therefore an appeal from an order granting an injunction, pendente lite, would leave the injunction in force. State v. City of New Orleans, 149 La. 788, 90 South. 196. It will not do to say that the defendant in such case might be quick enough to obtain and perfect an appeal from the order of injunction before the sheriff could serve or execute the writ. If the defendant’s only remedy in such case would be a suspensive appeal from the order of injunction, he would be entitled to a delay of 10 days in which to obtain and perfect the appeal. Code of Practice, arts. 566 and 575. AH of which reasoning would end in the anomalous proposition that an order granting an injunction pendente lite should not be executed or enforced within' 10 days after notice has been given to the party enjoined. In that respect, an order granting an injunction pendente lite is like an order refusing to dissolve the injunction, either peremptorily or on bond. In neither case has the defendant an adequate remedy by appeal, or otherwise than by invoking the supervisory jurisdiction of the appellate court. Osborne v. Clayton, 3 Rob. 437; Woolfolk v. Woolfolk, 22 La. Ann. 207; State ex rel. Doullut v. Judge, 29 La. Ann. 870, 872; Jefferson & L. P. R. Co. v. City of New Orleans, 30 La. Ann. 213; Town of Donaldsonville v. Police Jury of Ascension Parish, 33 La. Ann. 248; Fontelieu v. Gates, 36 La. Ann. 833; Schmidt v. Foucher, 37 La. Ann. 175; Succession of Labauve, 38 La. Ann. 357; State ex rel. Shakespeare v. Judge, 40 La. Ann. 609, 4 South. 485; Cottam v. Currie, 42 La. Ann. 876, 8 South. 600; State ex rel. Violett v. King, 46 La. Ann. 86, 14 South. 423; State ex rel. City of New Orleans v. Judge, 52 La. Ann. 1278, 27 South. 697, 51 L. R. A. 71; Wendling v. Dixie Ice Mfg. Co., 121 La. 187, 46 South. 205.
In support of the argument that this court has not jurisdiction or authority to issue writs of certiorari or prohibition in a ease like this, counsel for the respondents, Keegan and others, cite articles 845 and 857 of the Code of Practice. Article 845 purports to confine, the court’s authority to issue the writ of prohibition to cases where the judge of the'lower court is exceeding the bounds of his jurisdiction; and article 857 purports to limit the court’s authority to issue the writ of certiorari to cases where there is no right of appeal, and where the proceedings are so irregular that the judgment of the lower court would be absolutely void.
*649 Since the adoption of article 90 of the Constitution of 1879, which article was retained as article 94 in the Constitution of 1898 and in the Constitution of 1913, and retained as the first paragraph of section 10 of article 7 of the Constitution of 1921, giving the Supreme Court “control and general supervision over all inferior courts,” articles 845 and S57 of the Code of Practice have been obsolete. State ex rel. Murray v. Lazarus, 36 La. Ann. 578; State ex rel. New Orleans Gas Light Co. v. Judge, 37 La. Ann. 286; State ex rel. Hirsch v. Judge, 39 La. Ann. 97, 1 South. 281; State ex rel. Jacobs v. Judge, 40 La. Ann. 209, 3 South. 561; State ex rel. Le Blanc v. Henry, 41 La. Ann. 909, 6 South. 807; State ex rel. Rocchi v. Judge, 45 La. Ann. 532, 12 South. 941; State ex rel. Butler v. Ferguson, 48 La. Ann. 794, 19 South. 947; State ex rel. Babin v. Voorhies, 49 La. Ann. 1788, 23 South. 107; State ex rel. Moyse v. Guion, 50 La. Ann. 496, 23 South. 614; State ex rel. Broussard v. Voorhies, 51 La. Ann. 509, 25 South. 96; State ex rel. City of New Orleans v. Judge, 52 La. Ann. 1285. 27 South. 697, 51 L. R. A. 71; State ex rel. Collom v. Sommerville, 104 La. 645, 29 South. 280; State ex rel. Sorrel v. Foster, Judge, 106 La. 427, 31 South. 57; State ex rel. Young v. Sanders, 111 La. 194, 35 South. 509; State ex rel. Union Sawmill Co. v. Summit Lumber Co., 117 La. 645, 42 South. 196; Murat v. City of New Orleans, 119 La. 505, 44 South. 279; Thompson & Co. v. Gosserand, 128 La. 1029, 55 South. 663; Brunner Mercantile Co. v. Rodgin, 130 La. 358, 57 South. 1004; Loeb v. Collier, 131 La. 377, 59 South. 816.
 The fact that the order of injunction in this case was not an ex parte order, but was issued after allowing the defendant a hearing on a rule nisi, does not make the order one from which the defendant’s only remedy was an appeal, as from a judgment rendered in an ordinary judicial proceeding. The writ was issued on the face of the pleadings, and without other evidence; but, if the judge’s reasons for his ruling should stand affirmed, they would be the settled law of the ease.
Coming now to the question whether the plaintiffs in this case were entitled to the writ of injunction, we find that the board of commissioners of the port of New Orleans now has as complete authority to police the docks and wharves along the river front as the municipal counsel has ever had. The board was created, and its authority defined, by Act 70 of 1896. As amended by Act 36 of 1900, and by Act 14 of 1915, section 2 of the statute declares:
“That said board of commissioners shall have the power to regulate the commerce and traffic of the port and harbor of New Orleans in such manner as may, in their judgment, be best for its maintenance and development. They shall have and enjoy all the rights, powers and immunities incident to corporations. They shall be empowered, and it shall be their duty to have charge of, and administer the public whartes and landings of the port of New Orleans; to construct new wharves and other structures when necessary; to erect sheds and other structures on the wharves and landings; to place and keep the wharves and landings, sheds and other structures in good condition; to maintain proper depths of water at all such wharves and landings; to provide mechanical facilities for the use of such wharves, landings, sheds and other structures; to provide light, water, police _ protection, as under existing laws and other services for 'such wharves, landings and sheds, as they may deem advisable; to finance, erect and operate all basins, locks, canals and warehouse elevators,” etc.
This important provision was also made in the amending statute of 1915, viz.:
“That the former ordinances of the city of New Orleans applying to wharves and landings and river front of the city of New Orleans shall remain in full force and effect except as amended by the board of commissioners of the port of New Orleans, and all ordinances passed by said latter board concerning the territory, jurisdiction and control of the port of New Orleans, and the proper conduct thereof, shall *652 be enforceable by fine and imprisonment in the same manner as the ordinances of the city of New Orleans now are, that is, by fine not to exceed twenty-five dollars or an imprisonment not to exceed thirty days, the prosecutions to be carried on in the recorders’ courts of the city of New Orleans, or in the district courts in Jefferson and St. Bernard parishes.”
By Act 101 of 1920, a police department for the port was created and placed under the authority of the board of commissioners, viz.:
“Section 1. Be it enacted by the General Assembly of the state of Louisiana, that the board of commissioners of the port of New Orleans shall have and are hereby given authority, ,in their discretion, to appoint, fix salaries of and pay port and harbor police; said police to consist of such number of men, of good character and citizens of the state of Louisiana, not under 21 years of age, as said board of commissioners of the port of 'New Orleans shall, in their discretion, appoint as aforesaid. That said port and harbor police shall, each of them have under the direction and control of the commissioners the same power to make arrests, in and upon the wharves, landing-, canals, sheds, warehouses and all other structures and property within the jurisdiction of said board and approaches thereto, and to execute and return all criminal warrants and processes as sheriffs of this state now have, and shall, under the same direction and authority, have all the powers of sheriffs as peace officers in all places and on all premises under the jurisdiction and control of said board, and the streets and approaches thereto. That any persons arrested by officers of this board, and the return of all warrants or processes served by said officers shall be forthwith surrendered or delivered to the criminal sheriff of the parish of Orleans or sheriffs of St. Bernard and Jeffeirson parishes; provided this shall in no way deprive the New Orleans city police or any sheriff or deputy sheriff in the-parishes of Orleans, St. Bernard or Jefferson from making arrests or from serving warrants or process of court in any such place or on any such premises. That the said board of commissioners shall make rules and regulations for the conduct, management and control of said port and harbor police; and shall from time to time, enlarge, modify or change such rules and regulations in their discretion. That upon the appointment of such police, each of them shall enter into a good and solvent bond, in a sum not less than one thousand dollars, to be fixed by said board, conditioned for the faithful performance of all their duties; and any one injured or damaged by any one of said port and harbor police may bring suit upon said bond in his or her own name, for his or her benefit or use.
“Sec. 2. Be it further. enacted, etc., that so much of section 3 of Act 32 of 1904, as amended, creating a board of commissioners of the police department of the city of New Orleans and of section 16 of Act 159 of 1912, which requires the board of commissioners of the port of New Orleans to pay to the.board of commissioners of the police department of the city of New Orleans the sum of twelve thousand five hundred dollars per annum for policing the wharves and landings, be and the same is hereby repealed.
“Sec. 3. Be it further enacted, etc., that this act shall take effect from and after its promulgation and that all laws or parts of laws in conflict or inconsistent therewith be and the same are hereby repealed.”
 The statutes which we have quoted have made the police power of the board of commissioners over the docks and wharves as immune from interference by injunction, as is the police power of the municipal coun - cil throughout the city. The courts have no greater authority to prevent by injunction the execution or enforcement of a police regulation enacted by the board of commissioners of the port of New Orleans, in the exercise of the board’s police power over the docks and wharves, than to prevent the execution or enforcement of a police regulation enacted by the municipal council. There are cases in which the courts may, by injunction, prevent the execution or enforcement of a police regulation of a municipal corporation, but they are extraordinary cases, where the legislative body has exceeded or grossly abused its authority, and has invaded an individual’s vested or fundamental rigjit or immunity. McFarlain. v. Town of Jennings, 106 La. 542, 31 South. 62; New Orleans Baseball & Amusement Co. v. City of New Orleans, 118 La. 228, 42 South. 784, 7 L. R. A. (N. S.) 1014, 118 Am. St. Rep. 366, 10 Ann. Cas, 757; citing Dobbins v. City of Los Angeles, 195 U. S. *654 223; 25 Sup. Ct. 18, 49 L. Ed. 169; Le Blanc v. City of New Orleans, 138 La. 243, 70 South. 212; Patout Bros. v. Mayor & Board of Trustees of New Iberia, 138 La. 697, 70 South. 616; Crucia v. Behrman, 147 La. 144, 84 South. 525.
The police regulation complained of in this case, being enforced only during the strike on the river front, is not an abuse of the police power of the board of commissioners of the port. It does not invade any vested right or immunity of the plaintiffs in this suit. The judgment in their favor was based largely upon an expression in American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. 189, with regard to the rights of strikers, viz.:
“We must have every regard to the congressional intention manifested in the act [meaning the Clayton Act, October 15, 1914, chapter 323, 38 Stat. at L. 738, Comp. Stat. § 1243d, 6 Fed. Stat. Anno. 2d Ed. p. 141], and to the principle of existing law which it declared, that ex-employees and others properly acting with them shall have an opportunity, so far as is consistent with peace and law, to observe who are still working for the employer, to communicate with them and to persuade them to join the ranks of his opponents in a lawful economic struggle. Regarding as primary the rights of the employees to work for whom they will, and, undisturbed by annoying importunity or intimidation of numbers, to go, freely to and from their place of labor, and keeping in mind the right of the employer incident to his property and business to free access of such employees, what can be done to reconcile the conflicting interests?”
Of course, if the board of commissioners of the port bad Hot enacted this police regulation, in this emergency, it would be not unlawful or improper for the strikers and their sympathizers to go upon the wharves peaceably, to observe who are yet working on the ships in port, to communicate with them, and to persuade them to join the ranks of the strikers in this economic struggle. But that is not the question. The question is whether the board of ’commissioners has exceeded or abused its police power, by forbidding the use of the wharves otherwise ■than for business connected with the commerce and navigation of the port, during the strike. The complaint of the plaintiffs, in that respect, is that the order prevents their going upon the wharves for the purpose of picketing. Picketing, by strikers, is a detachment or stationing of men, either severally or in squads, at convenient places, persuading or trying to persuade other men not to take the places of employment vacated by the strikers, or persuading or trying to persuade thq employed men to quit their work and join the ranks of the strikers. It may well be that the board of commissioners was justified in the fear of the danger of allowing picketing, by the members of four labor unions and their sympathizers, on the wharves or docks, or in the sheds or in close proximity to the ships in port. In Truax v. Corrigan, 257 U. S. 340, 42 Sup. Ct. 124, 66 L. Ed. 266, the Chief Justice, for the court, said, of his previous ruling in American Steel Foundries v. Tri-City Central Trades Council, supra:
“We have but recently considered the clauses of section 20 of the Clayton Act, sometimes erroneously called the ‘picketing’ clauses. American Steel Foundries v. Tri-City Central Trades Council [opinion announced December 5th] (257 U. S. 184). * * *
“We held that under these clauses picketing was unlawful, and that it might be enjoined as such, and that peaceful picketing was a contradiction in terms which the statute sedulously avoided, but that, subject to the primary right of the employer and his employees and would-be employees to free access to his premises without obstruction by violence, intimidation, annoyance, importunity or dogging, it was lawful for ex-employees on a strike and their fellows in a labor union to have a single representative at each entrance to the plant of the employer to announce the strike and peaceably to persuade the employees and would-be employees to join them in it. We held that these clauses [in the Clayton Act] were merely declaratory of what had always been the *656 law and the best practice in equity, and we thus applied them.”
■ The responsibility of determining what precautions should be taken to avoid the danger of állowing men arrayed on opposite sides of a labor strike to assemble on the wharves and docks along the river front, in close proximity to the ships in port, is not on the courts, but on the board of commissioners of the port. So long as that department does not exceed its authority or abuse its trust, the courts would better not interfere. Our opinion is that the board did not exceed its authority or abuse its trust, in this instance, and that therefore the injunction should not have issued.
The order and writ of injunction complained of are annulled, at the cost of the respondents, Henry Keegan et al.
DAWKINS, J., concurs in the decree.