Common Pleas Court of Cuyahoga County.

LOUIS BERNSTEIN V. RETAIL CLEANERS' & DYERS' ASSN.

Decided February 20, 1934.

*A. B. Lefton,* for plaintiff.
*Simon J. Green,* for defendant.

HARRIS, J.

Plaintiff has long been a retail dry cleaner and has his place of business on Superior avenue near East 105th street in Cleveland, and hires seven assistants. He operates under the name "Park Avenue Cleaners." Last summer when the Blue Eagle of the NRA was distributed by the Post Office Department to employers throughout the country, he accepted one and used it in his business, although he says he did not sign and return the President's agreement.

On November 8th the President signed and promulgated the code of fair competition of the cleaning and dyeing trade, which became effective November 20, 1933. This

was done under and by virtue of the National Industrial Recovery Act, approved by the President June 16, 1933. The title of this act in part is "to encourage national industrial recovery, to foster fair competition * * *." Section 1 of Title 1 reads:

"A national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce, affects the public welfare, and undermines the standards of living of the American people, is hereby declared to exist. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof; and to provide for the general welfare by promoting the organization of industry for the purpose of cooperative actions among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, to eliminate unfair competitive practices, to promote the fullest possible utilization of the present productive capacity of industries, to avoid undue restriction of production (except as may be temporarily required), to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources."

Section 2 of said title authorizes the President to establish such agencies and utilize such services voluntary and uncompensated, and to prescribe their duties and to delegate his functions thereunder to them, as he sees fit.

Section 3 thereof provides for Codes of Fair Competition, such as that above referred to.

After the effective date of this code a national authority was created and granted power to police the industry. It delegated a portion of its authority to an Ohio Code authority and it delegated a part of its authority to defendant, The Retail Cleaners and Tailors' Association of Cleveland. The proper code authority established 75c as a fair price to be charged by retailers in Cleveland for cleaning and pressing a man's suit, and other prices for other such services. Plaintiff at first complied with this price. He used this Blue Eagle from the summer of 1933 until Janu-

ary, 1934, when it was taken from him because he had previously cut prices on men's suits to 69c and made other similar cuts.

Defendant is an association of retail cleaners and tailors in Cleveland representing this industry. After the Blue Eagle was taken from plaintiff, defendant caused a man continuously to carry in front of plaintiff's place a business a large sign on which was painted in large letters "Notice, This tailor shop is engaged in unfair competition violating the Code of Fair Competition for the Dry Cleaning Industry. Retail Cleaners' & Tailors' Association." He thereupon filed his petition and was granted a temporary restraining order. Defendants then answered and the case was advanced for immediate trial.

Plaintiff claims that this activity of defendants is an unlawful invasion of his property rights, and that the Nationed Recovery Act creates no legal basis therefor. His business, he urges, is entirely intrastate and intra—Cuyahoga county. Defendants deny these claims and insist that they are acting reasonably and that their conduct is authorized by law and harmonious with their just rights under all the circumstances.

On July 1st, 1933, the Ohio General Assembly passed the Ohio Recovery Act (115 O. L. 603) which became effective with gubernatorial approval July 12th, 1933. This act fully ratifies and approves the National Recovery act and adopts its principles as the Ohio policy during the present emergency.

Governor White, as the Ohio law provides he may, approved the Dry Cleaners' National Code before the facts creating the present dispute occurred. So that this code is, so far as our state legislative and executive authorities can lawfully make it so, the law of Ohio. In my opinion, therefore, plaintiff's conduct in violating the price provisions of the code was contrary to public policy. For that reason his petition, seeking equitable intervention, is untenable and must be dismissed. Indeed it is altogether probable that plaintiff might be proceeded against by injunction to stop his unfair competition with defendants.

Picketing, so-called, is a method long established as

legal, where not accompanied by intimidating and importunate conduct, as a means of endeavoring to settle economic disputes existing between workers and employers. The Supreme Court of the United States in *American Steel Foundry* v. *Tri-City Trades Council,* 257 U. S., 208 and 209, and the Ohio Supreme Court in *La France* v. *International Brotherhood,* 108 O. S., 61, have both approved it.

It has also been frequently used by groups desiring to accomplish political objectives. It is a publicity mechanism, designed to advise the public of the existence of a present controversy between those picketing and the one picketed. It is, of course, as the derivation of the word discloses, a warlike measure. But if the objective is the honestly believed correct disposition of a real and existing economic dispute it is legal. Its purpose is to advise those who observe the information published and circulated by the picketer that the controversy exists and its appeal is to those believing in the cause of the picketer to aid as they lawfully may in the proper settlement of the contest. It is an invitation to direct boycott by people who, if uninformed of the facts, might patronize the other party to the contest, whether those people be fellow workers or other prospective customers.

The picketing program has rarely been resorted to by others than labor unions, but in reason, so it seems to me, there is no real distinction between the right of union members so to do and the right of the defendants, under circumstances prevailing in the present emergency, likewise to act. It is a well known fact that the dry cleaning industry, which is operated in greater Cleveland alone by about 1500 retail dry cleaner shops and storekeepers, has been in a chaotic condition for many years, and that the industry has been infested with vicious racketeering here and elsewhere in the country. General Johnson quite truthfully stated in submitting the dry cleaners' code to the President:

"The trade has been harassed for the past three years by cut-throat competition, which in many cases led to racketeering, brought by slashing prices below cost, lowering wages, accompanied often by sweating labor, offering

inferior quality and poor services. These conditions have almost completely demoralized the business of plant owners and have caused untold hardships to some 175,000 or more tailor shops serving as retail outlets for the wholesale dry-cleaning plants. There are but few concerns in the trade who have any credit, and in many cases there are substantial amounts owed to labor for past due wages. Testimony at the hearing, for example, brought out the fact that over $600,000 in wages are long past due to workers in the city of New York.

*"Most of the havoc wrought in the cleaning and dyeing trade is attributed to price cutting.* Partly due to certain economies arising out of efficiency but primarily due to exploiting labor and rendering inferior quality and service to the public, a few operators of cut-rate stores are in an advantageous position to cut prices and to draw volume away from other plants at will. Witness the price war that has taken place over the past three years. The normal charge for cleaning and pressing a man's suit or a woman's dress was $1.50, but under pressure of keen competition from these operators who entered on an aggressive campaign for volume of business the price was gradually reduced to 29 cents; and recently by way of "special rates," to 19 cents. The other retail establishments, while forced to meet the competition to some extent, have not gone below 45 cents. However, it is a significant fact that at this rate most of the retail establishments are forced to operate at a loss."

A genuine economic dispute exists between plaintiff and his fellow retail dry cleaners. They are resorting to no force or intimidation. They are merely notifying those who pass by the vicinity of his store that he has been and is disregarding the code. So long as they do so without violating the ordinances of Cleveland and the laws of Ohio, and during the pendency of the emergency at least, they may continue.

It is unnecessary for me to pass on the constitutionality of the National Recovery Act and the operations conducted by the national, state and local recovery authority and their agents, as they affect purely intrastate business. In view of the Ohio legislation the doctrine of state sovereignty is not directly involved. Petition dismissed.