SlLBERT, J.
The plaintiff has for many years been engaged in the cleaning and dyeing business in Cleveland, where it has operated a high grade plant and employed a large number of men and women. When the NRA came into existence the plaintiff and others in that industry joined in an attempt to rid their industry of racketeering and' cutthroat competition. It accepted the NRA code and displayed the blue eagle and the Cleaning and Dyeing Code adopted thereunder for its own industry.
*178 The controversy we are here to consider came about when the plaintiff discharged one of its employees, a person named Raymond G. Myers who in turn complained to the local Joint Industrial Labor Board. The Board notified the Fuller Company about said complaint and set a time for the hearing. When the plaintiff ignored the summons the Board ordered Myers reinstated. When the plaintiff again ignored the Board’s ruling the defendants proceeded to picket the plaintiff’s etablishment calling the public’s attention to the fact that The Fuller Company had violated Section 7A of the NRA, and the authority of the Joint Industrial Labor Board. The plaintiff thereupon sought and obtained a temporary injunction which it now seeks to have made permanent.
The plaintiff contends that the collective bargaining features of the code are in no way involved in this controversy; that there is no violation of Section 7A, as the right to discharge an employee for cause has never in law been questioned. Consequently no court, no code authorities, and certainly no local board could in the opinion of the plaintiff order Myer’s reinstatement and the issuance of such an order is invalid and an unwarranted interference with its business, and in view of the fact that Thé Fuller Company has no adequate remedy at law,, it asks that the defendants be restrained from picketing i'ts establishment.
If the court were to accept the plaintiff’s premise and say that Myers was discharged for cause, it would then be likewise inclined to accept the plaintiff’s view of the law and say that an employer may always discharge an employee for any good and sufficient cause. The court would be inclined to go even further and say that an employer might discharge an employee without any cause if the contract is for an indefinite and unfixed period. In fairness to the defense, however, we must add in this connection that they do not in any way dispute this to be the law. It is their contention that Myers was discharged wholly and entirely for his collective bargaining activities; that the plaintiff in discharging Myers on the pretended claim he was a buffoon and annoyed the women employees, merely *179 invented a cause as an excuse for violating Section 7A of the NR A, and the lawful orders of the Joint Industrial Labor Board. Let us first consider therefore 'the question of fact as to whether or not Myers was discharged for cause.
For some time prior to March 8, 1934, some of the plaintiff’s employees had been planning to ask for an increase in pay; that as a result of these discussions they met on that day and drew lots to determine as to who should make this demand in their behalf. The lot fell to an employee named Bruno. Bruno apparently knew the code relative to the rights of employees to engage in collective bargaining ; he also appears to have known he had been especially selected by his fellows, yet he appeared none too enthuiastic for the task. Instead of feeling like a Moses about to lead the industrial slaves out of the financial wilderness; he appears to have felt more like a Jonah who might not only be tossed overboard into the sea of financial strife and swallowed; but he likewise appears to have entertained the fear that he would not be tossed up, but would actually be digested by the industrial whale.
He therefore hesitated and even attempted to withdraw from their arrangement when Myers and others attempted to prod him into action. It was during this prodding process that Comp, the plaintiff’s foreman, passed by, and after ascertaining the cause of the commotion, suggested they talk matters over with the Fuller superintendent. Myers was foolhardy enough to accept the invitation and the superintendent after hearing him out told him to take his hat and coat and go home.
It is clear, therefore, that Myers was discharged not because he was a buffoon or annoyed the women or any other sufficient cause, but because he participated, or attempted to participate, in collective bargaining for himself and his associates.
We know, of course, that the National Industrial .Recovery Act was passed by Congress and approved by the President on June 16, 1933, and that it had for its big objective the encouragement of national industrial recovery.. To achieve this purpose various means were suggested *180 amongst which was the construction of certain useful public works, and the fostering of fair competition in business and industry. We likewise know that the Act proceeded to set up the necesary legal machinery to aid in such a national recovery. Section 7A of the Act provides that every code of fair competition which should be decided upon in the various industries shall contain these conditions :
“That employees shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from interference, restraint, or coercion of employers of labor, or their agents in the designation of such representatives, or in self-organization, or in other, concerted activities for the purpose of collective bargaining, or other mutual aid or protection.”
On November 8, 1933, under authority of the NRA, the President signed and promulgated the code of fair competition of the cleaning and dyeing trade, which became effective November 20, 1933. This code specifically notes and emphasizes Section 7A relative to collective bargaining, Section (b) of Article VI of said code further provided for the creation of various agencies to be known as, Local Joint Industrial Relations Boards, with powers “to deal with all matters in the code relating to hours, wages, and general labor provisions.” These local boards were set up and caused to function in due course.
Thus the cleaning and dyeing industry adopted its own code and it did so by virtue of provisions granting such authority in the NRA. The Joint Industrial Board was created under authority of said cleaning and dyeing code; its principal objective was the creation of a tribunal for mediation, or the amicable settlement of disputes, and “to deal with all matters in the code.” It was to this board that Myers appealed for an adjustment of his controversy; and it was this board which eventually ordered his reinstatement. Did this board have the lawful authority to order Myers’ reinstatement? Was the plaintiff required to obey the mandates of the Joint Industrial Board? Could the board compel attendance and compel reinstatement? *181 Could the plaintiff, under the circumstances, appeal to the courts for redress? Should an injunction be granted plaintiff and those affected prevented from picketing?
The National Recovery Act was recently subjected to most bitter attacks by its opponents. Colonel Theodore Roosevelt charged that the government by means of it was becoming autocratic and was attempting to stifle industry and free speech and was attempting to turn this government into an autocracy. Laurence Dennis in the Mercury charged that Franklin D. Roosevelt was content in conducting a planless revolution with no definite objective.
It is not the, policy of this court to refute these arguments, nor to defend the policies of the national administration. In passing, however, we might attempt to define the NRA, and we would do so in the words of one of our eminent divines who said “it aims at cooperative voluntary planning under governmental guidance, but with a minimum of governmental control and ownership.” Much has already been achieved; we have seen material gains; the government has assisted in planning these gains, and has thereby restored public confidence and gotten the people to feel it was fully behind them. We may complain as much as we please about governmental interference, but the time is coming when capitalism will be obliged to reorganize itself to some extent. So too the day of rugged individualism is on the wane, and big business will be obliged to acquire a more humane and more unselfish side to its nature. It may be very well for our economists to say that industry and labor must regulate themselves by the natural laws of supply and demand, but when there is no demand; or when either the supply, or the demand might be controlled by private rights, the government in time of stress is justified in exercising a minimum of control to regulate commodities.
The policy of lawyers and the law has ever been to remain conservative. With all its conservatism, however, the law eventually took note of human progress and became part thereof. When, for example, the common law of England became too harsh and too technical, the judges invented technicalities to circumvent the harshness in the *182 common law. It was equity which came to the rescue of the common law and afforded a remedy where there was no adequate and complete remedy at law. Equity would invent trusts to protect the weak and the indigent in their estates. The trend of the law now is to avoid these quirks and subterfuges and to have a direct method of approach. If the bargain one now attempts to make is within the technical confines of the law, but contrary to its public policy, the court most likely will refuse relief. The law now takes moral and social, as well as the legal equation into consideration. This attitude expresses the viewpoint of our most enlightened courts.
Minnesota, for example, declared a moratorium on foreclosures and extended the date of mortgage redemption to 1935. Now to declare that a plaintiff must wait a definite period before being permitted to proceed with his foreclosure when the mortgage gives him the right to immediate action against the defendant, is clearly an abridgement of one’s contract rights. And yet the Minnesota Supreme Court declared the statute authorizing a moratorium was just and proper notwithstanding its interference with contract rights. It justified such a course on account of the economic interests of the state and the necessity to protect the public. This decision was upheld and approved by the U. S. Supreme Court. Home Building Assn. v. Blaisdell, 54 Sup. Ct., 231.
The Wisconsin Supreme .Court recently held in a case where the plaintiff foreclosed on defendant’s property and bought it in at a sheriff’s sale and then asked for confirmation of that sale and a deficiency judgment, that a sheriff’s sale does not now reflect the true market value of a property, and that a court of equity before confirming such a sale must consider what a property might bring on a normal market. The court therefore judicially took notice of present economic conditions and found that these conditions had caused almost a complete absence of market for realty. In such an emergency the court held it could decline to confirm the sale. So it could in its discretion take notice of the emergency and fix a minimum or upset price before the sale would be confirmed. It might likewise *183 establish the fair value of the property and require that it be credited on the foreclosure judgment, giving plaintiff the option of accepting or rejecting the valuation thus fixed. Suring State Bank v. Giese, et al., 246 N. W. 556.
Judge Harris recently ruled in a controversy between dry cleaners that those in that industry could be compelled to maintain prices agreed upon in their code. The question might well be asked where does a judge derive the constitutional authority to compel a man to charge more for his services than he desires to charge, and yet the learned judge ruled, and this court believes rightly, that the Ohio statutes approve the NRA, and the other codes involved and that plaintiff’s action in reducing prices was therefore contrary to the public policy of the state,, and that the plaintiff therefore would not be allowed an injunction against the defendants, as he has no standing in equity. The court thinks (dictum) that plaintiff’s unfair tactics might possibly be stopped by injunction. Bernstein v. Retail Cleaners, 31 N P. (N. S.) 433.
Appellant, a grocer, was arrested for violating the prices set up by the Milk Control Board. He contended the board had no power “to fix the minimum and maximum retail prices to be charged by stores to consumers,” and that its acts in doing so are unconstitutional and in violation of the guarantees of the equal protection and due process clauses .of the 14th Amendment.
In overruling the appellant the court held that government cannot exist if a citizen can use his property to the detriment of his fellows. The power to promote the general welfare is inherent in the government. Industry is subject to regulation in the public interest. Nothing bars legislative correction of maladjusted prices. The constitution does not secure to anyone liberty to conduct his business in such a fashion as to inflict injury upon any substantial group of people. Nebbia v. New York, 54 Sup. Ct. Rep. 505.
It is nothing new for the government to regulate industry and commerce; it has in fact done so ,'on many occasions in the past.- We recall, of course, that the Standard Oil Company was attacked by the government and *184 compelled to reorganize itself into smaller units by virtue, of The Sherman Anti-Trust Act and the Clayton Act. The government has done the same thing with other monopolies. From time to time the government has regulated Interstate Commerce and has done so without consent of the railroads and others involved.
The NRA, in the opinion of the court, is a great improvement over the methods we have invoked in the past. Instead of being autocratic, it is really most conciliatory in its approach. It does not attempt to bully or use a “big stick”; nor does it ask one to submit in a sheeplike manner to its rulings and mandates. Instead, it creates impartial boards; gives both industry and labor an equal voice in the proceedings before that board and permits them to regulate themselves as they see fit. The only thing it does insist upon is the collective bargaining features of the code, and even there it makes the reasonable request that the parties concerned be required to submit to mediation before resorting to the courts'for the adjustment of their grievances.
Plaintiff contends that the object of the board was merely to mediate; that there was no necessity of going before the board in the instant case as Meyers was discharged for cause and that there was therefore nothing for the board to mediate. Even if we were to accept the view that Myers was discharged for cause, which we do not, if the plaintiff claimed that Myers was discharged for cause, and Myers claimed he was discharged without cause, an issue is raised. When one, for example, sues another for negligence, can the party sued say “I’m not negligent; and there is therefore no issue, and I will not come to court?” The party sued is, of course, required to answer that we may ascertain the issue as to whether he was or was not negligent.
Can the plaintiff at this time be heard to say that it doesn’t approve certain of the policies of the NRA or that it doesn’t like any of the boards created thereunder “to deal” with such controversies?
It must be conceded that the NRA has in it many legal loopholes which might be variously construed. The pur *185 pose for which the NRA was created, however, must be kept constantly in mind, and that act and other codes thereunder must be liberally construed with a view to achieving their objectives. Now the Industrial Board was created “to deal” with such controversies as might arise under the codes. The plaintiff and others affected thereby were required to comply as all persons affected are required by law to subscribe whether or not they are in accord with their principles. The orders issued by the board were therefore binding orders; the plaintiff could not choose to ignore them. ■ If the plaintiff and others affected were permitted to ignore the board or treat its rulings as a game from which it might withdraw at any time, it would then become necessary to scrap all the machinery set up for its enforcement and the NRA could not possibly be made to function.
It was but natural under the circumstances for the defendants to make the facts known to the public and this it proceeded to do by means of peaceful picketing. There is, of course, ample right to picket if the picketing is done lawfully. Resorting to picketing as a means for settling economic disputes has long been established. See La France v. Electrical Workers, 108 O. S., 61. Also American Foundries v. Tri-State Trades, 257 U. S., 184.
Should the plaintiff under the circumstances indicated be allowed an injunction to prevent the defendants from picketing its business?
In Stanley v. The Peabody Coal Co., 5 Federal Supp., 612, a case recently decided by the Illinois District, the court held that labor disputes came within the Norris act prohibiting injunctive relief to a complainant who has failed to exhaust the governmental machinery set up for that purpose.
It is true that in the case referred to the code was more specific than in the case at bar. In that case there was a provision made for appeal to the Bituminous Labor Board, whereas such appeal is not provided for in the case we are considering. And yet, despite that fact, the idea and the principle is the same, and as the rule is both fair and just it should be applied here. As we stated previously we *186 realize full well that the NRA and many of the codes thereunder are loosely drawn, but as we also stated the objectives must be kept constantly in mind. Where boards have been created for the purpose of mediating, should we permit industries to ignore these boards, interpose technical objections and choose their own forums? Why have boards at all if we do not intend to subscribe to the letter and the spirit of the law under which these boards were created?
As a condition precedent to relief in our courts therefore, it would seem to be the law that one seeking injunctive relief under the NRA, or its various codes and boards is first required to avail himself of the agencies set up for mediation purposes. And this is a just and equitable rule. Particularly is this true when it is recalled that the plaintiff has accepted the benefits to be derived from the various codes. Having accepted the benefits the plaintiff should likewise be compelled to accept its detriments.
The court is therefore required to refuse the plaintiff the relief prayed for. The injunction will accordingly be dissolved, to which the plaintiff duly excepts.