Arthur R. WEIR and Quikbrik Company
of Chicago, Inc., Plaintiffs-Appellants,

v.

CHICAGO PLASTERING INSTITUTE
et al., Defendants-Appellees.

No. 12694.

United States Court of Appeals
Seventh Circuit.

Dec. 23, 1959.

884

Kenart M. Rahn, Chicago, Ill., Parkhill, Severns & Stansell, Chicago, Ill., of counsel, for appellants.

John L. Vette, William T. Kirby, Thomas M. Thomas, Hugh J. McCarthy, Thomas B. Martineau and John J. Enright, Chicago, Ill., John M. O'Connor, Jr., Chicago, Ill., of counsel, for appellees.

Before HASTINGS, Chief Judge, CASTLE, Circuit Judge, and PLATT, District Judge.

CASTLE, Circuit Judge.

Plaintiffs-appellants, Arthur R. Weir and Quikbrik Company of Chicago, Inc., brought suit in the District Court to recover for damages alleged to have been suffered by plaintiffs to business and property by reason of a boycott. Defendants-appellees are Chicago Plastering Institute Inc.,[1] Journeymen Plasterers Protective and Benevolent Society, OP & CFIA, Local Union No. 5,[2] Employing Plasterers Contractors Association of Chicago[3], Byron W. Dalton,[4] J. W. Farr & Co.[5] and J. Woodcock.[5]

Plaintiffs predicate liability of defendants for treble damages under 15 U.S.C.A. § 15 on conduct alleged to constitute a violation of the antitrust provisions of 15 U.S.C.A. § 1. In addition plaintiffs claim a "secondary boycott" by defendants Dalton and Local No. 5 in violation of, and entitling them to damages under, 29 U.S.C.A. § 187.

The district court at the conclusion of plaintiffs' evidence granted the motions of all defendants for a directed verdict and entered judgment for defendants. Plaintiffs appealed and contend that the court erred in not submitting the case to the jury. Subsidiary contentions made by plaintiffs include claims that the court erred (1) in rulings on the admission of evidence and on offers of proof, (2) in refusing to hear oral argument, (3) in failing to certify to the Attorney General that the constitutionality of an Act of Congress affecting the public interest had been put in issue by defendants' pleadings, (4) in failing to make findings of fact, and (5) that the District Court's

1. Herein referred to as Institute.

2. Herein referred to as Local No. 5.

3. Herein referred to as Association.

4. President of Institute and president of Local No. 5, sued individually and as representative of the membership of Local No. 5.

5. A plastering contractor.

executive committee erred in reassigning the case to the trial judge.

The main contested issue is whether there was evidence which when viewed in the light most favorable to plaintiffs, together with all reasonable inferences that might be drawn therefrom, would, as a matter of law, sustain a verdict for plaintiffs.

■ It would serve no purpose to attempt to summarize all of the evidence. In so far as it is pertinent to establishing the existence of a boycott in violation of either the Sherman Act (15 U.S.C.A. § 1) or the Labor Management Relations Act (29 U.S.C.A. § 187), and viewed in the light most favorable to plaintiffs, accepting plaintiffs' version or that most favorable to plaintiffs where there is difference or conflict in the testimony, the record establishes the following facts.

The Institute is a not-for-profit membership corporation the officers and directors of which are representative officers of labor unions, plastering contractors and persons engaged in the plastering business. Its purpose, to promote the use of plaster products, is stated in its charter as follows:

"The advancement of plaster construction over inferior substitutes, by (1) education of the public, and (2) by sponsoring legislation calculated to preserve the health and safety of the public by the use of plaster construction, and (3) discourage attempts to pass legislation derogatory to plaster construction, and (4) to do those things which are necessary and proper to promote and enhance the plastering industry."

Institute provides retirement pensions, compensation for illness and injuries, and death benefits for those employed in the plastering industry.

The Association is an incorporated not-for-profit, trade association. Its members are approximately 36 Chicago plastering contractors. Local Union No. 5 is an unincorporated trade union composed of approximately 1200 journeymen and apprentice plasterers who engage in their trade as employees of plastering contractors. The Constitution and By-Laws of Local No. 5 provide:

"Sec. 96. Any person or firm desiring to become plastering contractors and employ members of Local No. 5 must qualify according to the following rules: They must be examined by our Examining Board and prove that they know the fundamentals of plastering. They must show sufficient bank account or credit to meet their material bills and pay-rolls, and they must also furnish a surety bond not less than Ten Thousand Dollars ($10,000) to insure the payments of our members at all times. Any member of Local No. 5 desiring to become a plastering contractor must make application in writing and appear before the Examining Board for a hearing. He must also be a member of Local No. 5 in good standing for a period of five years. This does not necessarily apply to honorably discharged men from the armed services. A thirty (30) days notice must be posted for all applicants who are to be examined as Contractors."

A collective bargaining agreement between Local No. 5 and the contractor members of the Association contains provisions under which each makes financial contributions to Institute for the following purposes:

"(a) Educating the public of the superiority of plaster construction over inferior substitutes.

"(b) Sponsoring legislation that is calculated to preserve the health and safety of the public by the use of plaster construction.

"(c) To do those things which are necessary and proper to promote and enhance the plastering industry.

"(d) To provide health and hospital insurance and other benefits for the aforesaid employees."

The Association agrees to assess and collect from its members, and to contribute, a sum equal to 6% of employee's

wages (later changed to 16 cents per hour per man employed). Local No. 5 agrees to contribute a sum not to exceed ½ cent per hour for each hour each of its members are employed by contractor members of the Association.

Early in 1952 plaintiff Weir entered into an agreement with American Cement Products Company of Detroit, Michigan under which he became an authorized applicator of its product known as Quikbrik. Quikbrik, as a process, may be described as a method whereby an imitation brick surface may be applied to the interior or exterior surface of a building. A lath-like frame is first affixed to the surface. A coating of cement is then applied. While the cement is still soft the product Quikbrik, a mixture of crushed building material similar to ground brick, is pressed into the cement. When the mixture is partially dried the "joints are struck", that is, by means of a rack and a cutting tool, grooves are formed which show the underlying cement and cause the finished surface to have the appearance of a brick wall.

Weir called on defendant Dalton, President of Local No. 5, and showed him samples of and literature concerning Quikbrik. Dalton was impressed with the product. Weir advised that he wanted to become a plastering contractor and hire union plasterers, members of Local No. 5. Dalton promised full cooperation and telephoned the lathers' union requesting that it cooperate with Weir. Dalton told Weir that "he could hire at that time union help". Weir thought his conversation with Dalton constituted approval of Weir as a plastering contractor by Local Union No. 5. Weir proceeded to purchase contracting equipment and obtained a Quikbrik job. Weir telephoned Albert J. Frost, then business agent of Local No. 5, and told him he wanted a plasterer to work on a job, stating that Dalton said it was O.K. Weir told Forst that his work was cleared through the union. Forst was unable to reach Dalton by telephone to verify Weir's statement. Forst sent a plasterer, member of Local No. 5, to Weir to work on the job he then had. The job was completed in about a week.

At a second interview with Dalton, Weir discussed the matter as to whether or not the "striking of the joints" was to be performed by union plasterers or by ordinary union labor. Dalton insisted that this operation be performed by union plasterers.

Weir organized or caused to be organized the plaintiff Quikbrik Company of Chicago, Inc., and subscribed to 75% of its capital stock.

Upon obtaining two additional contracts for Quikbrik jobs Weir telephoned John Boland, a business agent for Local No. 5, to secure union plasterers. At Weir's request Boland called at Weir's home on a Saturday where he was told that Weir had two jobs to do and wanted union plasterers. Boland said he would have to check with Dalton. Weir suggested that he telephone Dalton as he needed the men for Monday morning. After making the telephone call Boland told Weir "I am sorry you did not make an impression on Dalton. I can do nothing for you. You are through." Weir proceeded to perform the work with nonunion plasterers.

Weir never did appear before Local No. 5's examining board and obtain approval of himself or the corporation as a plastering contractor eligible to employ its members as required by Sec. 96 of the Union's Constitution and By-Laws. The corporate plaintiff, Quikbrik Company of Chicago proceeded to do twelve or more Quikbrik jobs between July and October 1952.

In February of 1953 plaintiff Weir obtained a distributor's franchise from American Cement Products Company giving him the right to appoint dealer-applicators within a territory consisting of portions of Illinois, Wisconsin and Indiana. Weir solicited and obtained contracts from seven Chicago plastering contractors. Each such dealer was required to purchase an initial order of

Quikbrik and to rent various tools at a total cost of $1,350.

In April of 1953 one of these Chicago Plastering contractors, defendant J. Woodcock, who was not a member of the Association, told Weir he had turned down an offer of a Quikbrik job, stating "You know I can't do it. Dalton is mad at you and I can not proceed. I can not do any more Quikbrik jobs until you get straightened out with Dalton. Go down to the Union hall and make a date to go before their executive board. Maybe that will straighten it out." Weir called at the union hall where Forst told him that "Dalton is handling that whole deal of yours". Weir tried to reach Dalton by telephone many times and called at his office but Dalton refused to talk to him. Some of the Chicago plastering contractor dealer-applicators of Quikbrik did not reorder after their initial order. American Cement Products Company cancelled its contracts with plaintiff Weir in January of 1954. Following a meeting with Dalton, Sands, manager of American Cement Products had written Dalton in December of 1953 that "we have completely washed our hands of Art Weir as a distributor."

The Sherman Act (15 U.S.C.A. § 1) declares illegal:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations * * *."

A contract, combination or conspiracy is an essential element of a violation.

The record clearly establishes that plaintiffs were unable to secure union plasterers. Whether this was because of Dalton's displeasure with Weir because of the latter's desire to use other than union plasterers for that phase of Quickbrik application described as "striking the joints", Weir's subsequent employment of non-union help, or for some other reason, it is equally apparent that the record is barren of any evidence of a combination, agreement or conspiracy among the defendants either to boy-

cott the product Quikbrik, boycott Weir as a distributor, or boycott Weir or Chicago Quikbrik Company, Inc., as dealer-applicators. Nor, in our opinion, could the jury have properly reached a conclusion that such a conspiracy existed by any reasonable inference from the facts proven. There is a total absence of proof that any restraint of any kind existed as to the flow of Quikbrik materials in interstate commerce or as to its use. Plastering contractors, members of Association, performed Quikbrik jobs with union plasterers and plaintiffs performed Quikbrik jobs with non-union help without interference from Local No. 5 or from any of the defendants. Dalton's or Local No. 5's refusal to furnish union plasterers to plaintiffs was not shown to have been pursuant to any combination, agreement or conspiracy with any of the other defendants. The requirements of Sec. 96 of the Constitution and By-Laws of Local No. 5 were not shown to have been the result of any agreement or conspiracy with the Association, the Institute or the plastering contractor defendants. Sec. 96 is not, as plaintiffs infer, a part of the collective bargaining agreement between Local No. 5 and the Association. And neither the requirements of Sec. 96 nor any refusal of Dalton or Local No. 5 to furnish union plasterers to plaintiffs constituted a violation of 15 U.S.C.A. § 1. In Hunt v. Crumboch, 325 U.S. 821, 824, 65 S.Ct. 1545, 1547, 89 L.Ed. 1954, it is pointed out that:

"It is not a violation of the Sherman Act for laborers in combination to refuse to work. They can sell or not sell their labor as they please, and upon such terms and conditions as they choose, without infringing the Anti-trust laws. Apex Hosiery Co. v. Leader, 310 U.S. 469, 502–503, 60 S.Ct. 982, 997, 998, 84 L.Ed. 1311. A worker is privileged under congressional enactments, acting either alone or in concert with his fellow workers, to associate or to decline to associate with other workers, to accept, refuse to accept, or to terminate a relationship of

employment, and his labor is not to be treated as 'a commodity or article of commerce.' Clayton Act, 38 Stat. 730, 731, 15 U.S.C.A. § 12 et seq.; Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C.A. § 101 et seq.; see also American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 209, 42 S.Ct. 72, 78, 66 L.Ed. 189."

There being no evidence of concert with others in either connection, the doctrine of Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 has no application. That points of contact or relationships for promotion of mutual interests existed among the defendants on other matters, such as support of Institute, does not on the facts here proven give rise to any reasonable inference that plaintiffs' difficulties with Dalton or Local No. 5 were the result of agreement or concert of action between the Local and its president and any one or more of the other defendants.

Plaintiffs claim a violation of that portion of 29 U.S.C.A. § 187 which makes it unlawful for any labor organization:

" * * * to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—

"(1) forcing or requiring any * * * employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *".

■ In this connection plaintiffs contend that Local No. 5 engaged in a concerted refusal to furnish labor to Weir with the object of compelling him to cease doing business with his supplier of Quikbrik materials and that after Weir became a distributor Local No. 5 engaged in a refusal to supply labor to contractor-dealers of Weir for the purpose of forcing Weir out of business. An examination of the record discloses no evidence that Dalton or Local No. 5 were in any manner opposed to Quikbrik or the supplier, American Cement Products Company. None of the defendants regarded Quikbrik as an inferior substitute for plaster or opposed its use. Plastering contractor members of the Association performed Quikbrik jobs with union labor without interference. The refusal to furnish union plasterers to Weir was not a secondary boycott. We find no merit in plaintiffs' contentions with respect to a violation of 29 U.S.C.A. § 187.

It is our conclusion that the evidence when viewed most favorably to plaintiffs, together with all reasonable inferences that might be drawn therefrom, would not warrant a jury finding that the conduct of defendants or any of them constituted a violation of either the Sherman Act (15 U.S.C.A. § 1) or the Labor Management Relations Act (29 U.S.C.A. § 187).

■ We have considered but find no merit in plaintiffs' claims of error in rulings on admission of evidence and offers of proof. Nor was the trial court's refusal to hear oral argument on the motions for a directed verdict reversible error. Cf. Federal Communications Commission v. WJR, 337 U.S. 265, 69 S.Ct. 1097, 93 L.Ed. 1353.

■ The failure to make findings of fact was not error. The Federal Rules of Civil Procedure 28 U.S.C.A. do not support plaintiffs' complaint of absence of findings. Findings of fact are not required on the granting of a motion for directed verdict.

■ The defendants' pleadings did not raise a question as to the constitutionality of 29 U.S.C.A. § 187 on its face and therefore certification to the Attorney General was not required. Cf. Keyes v. Madsen, 86 U.S.App.D.C. 24, 179 F.2d

40. In any event it does not appear that plaintiffs were in any way prejudiced by failure of such certification.

 Plaintiffs contend that it was error for the District Court's Executive Committee to make the reassignment of the case to the trial judge who heard it. A case involving similar issues had been heard previously by that judge and the rules of the district court authorized reassignment of a related cause. In any event no prejudice to plaintiff was shown.

The plaintiff has discussed other points in his brief. We have considered them and find them to be without merit.

The judgment of the District Court is affirmed.

Affirmed.